# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 4, 2014 Session

## STATE OF TENNESSEE v. JUSTIN ELLIS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 93768      Bob R. McGee, Judge**

_____

**No. E2011-02017-SC-R11-CD - Filed January 13, 2015**

_____

We granted the State of Tennessee permission to appeal in this criminal proceeding to address two issues: (1) the analytical framework that a successor judge should utilize in deciding whether he can act as the thirteenth juror, and (2) the standard of appellate review of a successor judge's determination that he can or cannot act as the thirteenth juror. We hold that there is a rebuttable presumption that a successor judge can act as the thirteenth juror. We also hold that an appellate court should review de novo a successor judge's decision about acting as the thirteenth juror. Applying these principles to the instant case, we hold that the successor judge committed no reversible error in determining that he could act as the thirteenth juror. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the trial court's judgments of conviction.

## Tenn. R. App. P. 11 Appeal by Permission;
## Judgment of the Court of Criminal Appeals Reversed;
## Judgments of the Trial Court Reinstated

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and HOLLY M. KIRBY, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellant, State of Tennessee.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellee, Justin Ellis.

# OPINION

## Factual and Procedural Background

Justin Ellis ("the Defendant") was charged with two counts of aggravated burglary, one count of employing a firearm during the commission of a dangerous felony, one count of especially aggravated kidnapping as to victim Isiah Cobb, one count of especially aggravated kidnapping as to victim Jessica Greene, one count of aggravated robbery of victim Cobb by fear, one count of aggravated robbery of victim Cobb by violence, one count of aggravated robbery of victim Greene by fear, and one count of aggravated robbery of victim Greene by violence. Prior to trial, the State dismissed one of the aggravated burglary counts and the two counts of aggravated robbery as to victim Cobb.

At the ensuing jury trial in October 2010, the prosecutor explained during her opening statement that Isiah Cobb and Jessica Greene ("the victims") lived in a house together with their roommate, Justin Woodruff, the Defendant's cousin. She stated that the Defendant broke into the house within hours of Woodruff moving out. The Defendant threatened the victims with a gun and stole cash, Christmas gifts, and Cobb's car.

Defense counsel asserted during his opening statement that the Defendant had been staying with the victims and Woodruff for several days as a guest in the victims' house. The Defendant knew that the victims kept a quantity of marijuana in the house. While the victims were out of the house, the Defendant found and took the victims' marijuana. After the victims got home and were in the bedroom, the Defendant took their car keys and the marijuana and left in Cobb's car. Because the victims did not want to tell the police about the marijuana that had been stolen from them, they fabricated the theft of other items of similar value.

After opening statements concluded, the following proof was adduced:

Officer John David Lawson of the Knoxville Police Department testified that he responded to a call from 167 Chickamauga Avenue in Knox County ("the House") at approximately 12:24 a.m. on December 29, 2009. There, he met two victims, and they informed him that they had been "robbed." Officer Lawson viewed the House, and he described it as being in "disarray." He examined the back door of the House and described it as "damaged and didn't have a very good lock on it." Officer Lawson also explained that

his patrol car recorded the conversation that he had with the victims while they were outside the House. The recording was admitted into evidence and played for the jury.[1]

On cross-examination, Officer Lawson acknowledged that the victims told him that about $650 in cash and some jewelry had been taken. He also acknowledged that he had never been inside the House before and did not know if the "disarray" he observed was typical or not. When asked to describe the damage he noticed to the door, Officer Lawson testified, "Well, the strike plate was – looked old and worn, and it looked like it had been knocked around a little bit, and it was cracked." He clarified that it was the frame around the strike plate that was cracked and that the frame was not knocked out of the door. He did not notice any footprints or other marks on the door. He did not request that any photographs be taken of the door.

On redirect examination, Officer Lawson testified that his written report indicated that the victims stated that their assailant had taken a wallet, a purse, $650 in cash, two cell phones, jewelry, coins in a jar, clothing, and the keys to a Mercury car.

Isiah Cobb, twenty-one years old at the time of trial, testified that, in December 2009, he lived at the House with his girlfriend, Jessica Greene. He had been living there approximately six months. In August 2009, Justin Woodruff moved into the House with them. Cobb understood that Woodruff and the Defendant were friends. While he lived in the House, Cobb worked for Little Caesars as a manager.

Cobb got home at about midnight on the night in question. He and Greene were inside the House with the "bottom door handle" locked. While Cobb was in the "back room," he "heard a loud commotion bust through the back door." Cobb was talking to Greene's brother on his cell phone and went to investigate. He saw the Defendant inside the House near the back door, holding a gun. Cobb stated that the Defendant was wearing gloves and a black hoodie. The Defendant told Cobb to drop his phone and then demanded Cobb's belongings.

Cobb testified that the Defendant pointed his handgun at Cobb's face and chest and ordered Cobb not to move. The Defendant told Cobb that, if Cobb moved, the Defendant would kill him. The Defendant also pointed his gun at Greene, saying, "What you got in your bra? Where is the money at?" Cobb testified that the Defendant told both him and Greene to remove their clothes.

---

[1] This Court has listened to the recording, but the poor sound quality rendered most of the conversation incomprehensible. A male voice can be heard exclaiming, "$650 in rent," and the same voice later refers to additional bills.

While the Defendant held the victims at gunpoint, he was "packing as much stuff as he can in his pockets." The Defendant also put things in a bag. The Defendant took a Nintendo DS, an iPod touch, an "in-dash stereo," a change jar, some jewelry, Greene's purse, and some clothing. The Defendant also took Cobb's wallet, including approximately $1100 in cash, and Cobb's car keys. Cobb explained that he had the cash to pay bills, including "about $600 to pay [his] rent," his electricity bill, and both his and Greene's cell phone bills.

The Defendant left and returned less than a minute later, again ordering the victims not to move. The Defendant again left and returned, and, according to Cobb, "basically stayed inside the house for like another two and a half, three minutes arguing with [him and Greene]. Telling [them], 'Where's the rest of the money. I know you hiding something in here. If you don't give it up, I'm going to kill you.'" Cobb testified that he was afraid the Defendant was going to kill him.

The Defendant finally left in Cobb's car, a Mercury Grand Marquis. Afraid that the Defendant was waiting to kill him, Cobb remained where he was until Greene's brother arrived. At that point, Greene was able to call the police on her brother's phone.

Cobb stated that, about one week prior to these events, Woodruff and the Defendant had come by the pizza store where Cobb was working, and the Defendant took an employment application. Cobb told the Defendant that he would try to get the Defendant hired. Cobb also stated that Woodruff moved out of the House on the day preceding the home invasion.

On cross-examination, the defense established that Cobb earned $11 dollars an hour, $16.50 an hour for overtime, and that he worked fifty-two to fifty-three hours per week. Cobb stated that he made "about 25 to three grand a month – well, I say every two weeks, somewhere in that range. I'd say about 20 – anywhere from 22 to 28."[2] Cobb acknowledged that he originally claimed that the value of the cash and items taken from the House was approximately $9,000. He added that some of the items taken were Christmas gifts from other people.

Cobb acknowledged that he refused to accede to the Defendant's demand that he take off his clothes, explaining that he was "so scared, [he] don't [sic] even know what to do." When asked about his previous contacts with the Defendant, Cobb responded, "I had seen him before when I was at work, and I've seen him around Justin Woodruff, but he had never

---

[2] Forty hours at $11 per hour is $440. Thirteen hours at $16.50 per hour is $214.50. Thus, utilizing Cobb's hourly wages, a fifty-two hour week would result in gross pay of $654.50, or approximately $2618 per month.

been at my house before." Cobb acknowledged, however, that it was possible that, without his knowledge, Woodruff had had the Defendant over to the House while Woodruff was living there.

In response to questions by the jury, Cobb testified that he had cash on him that night and that he was going to convert the cash to money orders the next morning, which he would then mail to pay his bills.

Jessica Greene, nineteen years old at the time of trial, testified that she had worked as an assistant manager at the Little Caesars on Broadway in Knoxville and, later, for a cleaning service. For Christmas 2009, her brother gave her an "iPod DS," an iPod touch, and a Nintendo DS. She also had been given a Juicy Couture purse, a Coach purse, and a Coach wallet, as well as some clothes and jewelry. She and Cobb also had two cell phones, a 1995 Cadillac, and a Grand Marquis vehicle.

Greene identified the Defendant and stated that she had seen him two or three times before the night of December 28-29, 2009. On that night, she testified, she and Cobb had come home with dinner and gone into their bedroom to eat. She heard "a big commotion." She then saw the Defendant come into the bedroom with a gun pointed at her. She described the gun as "black and chrome. It looked like a 9-millimeter." The Defendant said, "Get on the ground. I need everything. I need money, purses, everything y'all have." Greene got down on her knees and kept her hands visible to the Defendant. The Defendant told Cobb and Greene to gather their things and "throw the stuff across the room to him." Greene threw her phone to the Defendant. He came over to her and tugged on her shirt, telling her to take it off, but she refused. The Defendant then "kind of just left [her] alone." Greene testified that she was scared the Defendant would shoot her if she got up.

After the Defendant finished collecting their things, he told them, "Now, don't get up. I'm not playing with you guys, or I'll kill y'all." He told them he was "going to go put their stuff in the car," and he left. He returned a short time later and again warned the victims not to move. Greene knew that her brother was on the way because Cobb had been talking to him on the phone earlier. Her brother arrived after the Defendant pulled off in the Grand Marquis, and she then was able to call 911. The recording of her phone call to 911 was

admitted into evidence and played for the jury.[3] Greene acknowledged that, while she was talking to the 911 dispatcher, she was asking Cobb a lot of questions.

Greene testified that she did not see the Defendant come through the door into the House. Initially, she thought that Cobb had left the door unlocked, "but then [they] realized that [the Defendant] kicked it in, because the bottom lock was broke[n]." She stated that she showed the broken lock to the police.

On cross-examination, Greene acknowledged that Cobb called Woodruff before she called 911. She also acknowledged that, when the 911 dispatcher asked her what the Defendant had been wearing, she repeated the question to Cobb before answering. She stated that she wanted to "make sure" to provide an accurate description. Initially, she told the 911 dispatcher that the Defendant had been wearing yellow gloves, but Cobb corrected her and told her that he had been wearing red gloves. She also told the dispatcher that the Defendant had not forced his way in. Cobb then told her that he had. She testified that she had not seen the Defendant come through the door of the House, so she was not sure how he got in. Greene also stated on cross-examination that the armed Defendant had told her to take her shirt off and that she had told him, "No."

The State rested its case-in-chief after Greene's testimony. The defense put on no proof. During closing argument, the prosecutor asserted that there had been no proof that the victims were drug dealers. She described the victims as "two good kids. Only thing that they did was work." The prosecutor then focused on how the Defendant's actions constituted the various crimes with which he was charged, emphasizing the especially aggravated kidnapping charges. Defense counsel focused on Officer Lawson's testimony that the doorframe was not broken and that he had not seen any footprints on the door; Greene's conflicting statements about the color of the gloves that the Defendant had been wearing; that the victims had each refused to do something that the Defendant told them to do in spite of claiming to be scared that the Defendant would shoot them; that the victims' accounts of what happened amounted to robbery but not kidnapping; and that the Defendant stole the victims' property but did not rob or kidnap them. In rebuttal, the prosecutor argued that the victims' testimony was consistent with the police recording and the 911 call and that the victims "have no reason to lie."

---

[3] This Court has listened to the recording. Greene reported that she and Cobb had been robbed at gunpoint, and she identified the Defendant by name as their assailant. During her conversation with the 911 operator, Greene asked someone what the Defendant had been wearing and also asked for assistance in describing the Defendant's weight and height. Greene initially reported that the Defendant had not forced his way into the House but corrected that statement when a male voice told her he had. Greene reported that approximately $1200 in cash had been taken, as well as other items of property.

After deliberating, the jury convicted the Defendant of aggravated burglary, employing a firearm during the commission of a dangerous felony, aggravated robbery of Greene by fear, and aggravated assault as a lesser-included offense of the aggravated robbery of Greene by violence. The jury acquitted the Defendant of the kidnapping charges. The trial judge did not expressly accept or approve of the jury's verdict.

After the Defendant's trial and before the sentencing hearing, the trial judge left the bench and a successor judge was designated ("the designated judge"). The designated judge held a sentencing hearing, merged the aggravated assault conviction into the aggravated robbery conviction, and sentenced the Defendant to an effective term of fourteen years. After sentencing, the designated judge transferred the matter to a different division "for further proceedings." The Defendant timely filed a motion for new trial, alleging, in part, that a successor judge could not act as the thirteenth juror because witness credibility was the "over-riding issue." A successor judge ("the successor judge") conducted the hearing on the motion for new trial.

At the motion for new trial hearing, defense counsel argued that the successor judge could not rule as the thirteenth juror because credibility was the central issue of the case. The successor judge rejected this argument as follows:

> [I]t does appear that the <u>Biggs</u> case[4] is limited to where, not just where [credibility] is overriding. I think that's the word they use, but it's actually a situation where [credibility] is the whole case.
>
> It is limited pretty much to situations that we sometimes call he said, she said, where the only evidence of the crime is the testimony, the victim, and the only evidence rebutting that – is the testimony of the defendant. And we are post-trial now, the defendant's right to testify or not to testify was protected at the trial and he made his decision. In judging retrospectively, what the quality of the verdict was. Certainly we are – we have to take into consideration what the testimony was and the fact is in this case there was no testimony contradicting the testimony of the victims. None.
>
> We don't have witness versus witness here. We have witness versus argument and that's not what the <u>Biggs</u> case is about. Also, I did read the transcript. The tenor of the testimony of the [victims] was not that they refused to take their clothes off because they were standing up to the guy.

---

[4] <u>State v. Biggs</u>, 218 S.W.3d 643 (Tenn. Crim. App. 2006).

They both testified they were scared to death that if they moved at all he would shoot them. The jury apparently accepted that testimony.

Also, there was never any real dispute that the defendant was present in the premises and that he stole things from them. So, it's not even by – you can't even say that the idea was floated to the jury that none of this ever happened. That wasn't in any way presented to the jury. And there was evidence to support the proposition that there was a breaking and entering, damage to the back door. Particularly the witness, I think Jessica Greene, Ms. Greene at least testified that the bottom lock, she called it, was broken. So, this is not a situation where the case hangs entirely on [credibility]. The [credibility] of the victims was not rebutted. There was nothing for the jury to weigh in opposition to the [credibility] of the witnesses. They found the witnesses to be [credible] and they also apparently gave considerable attention to the case and reflected upon it because they found him not guilty of the kidnapping charges. And it would appear to this Court that the jury did what they were supposed to. They did a good job and this Court does accept their verdict.

(Footnote added). The trial court denied the Defendant's motion for new trial.

The Defendant appealed, and the majority of the Court of Criminal Appeals panel reversed on the thirteenth juror issue, holding that "witness credibility was an overriding issue and . . . a new trial is therefore required." State v. Justin Ellis, No. E2011-02017-CCA-R3-CD, 2013 WL 1189443, at *8 (Tenn. Crim. App. Mar. 22, 2013). The third member of the panel dissented and asserted that, under an abuse of discretion standard of review, the successor judge should have been affirmed on his decision to act as the thirteenth juror. Id. at *10 (Wedemeyer, J., dissenting). We granted the State's application for permission to appeal in order to determine the proper analytical framework a successor judge should utilize in making his determination of whether he can act as the thirteenth juror; the proper standard of appellate review of a successor judge's decision that he can or cannot act as the thirteenth juror; and, applying these parameters, the appropriate result in this case.

**Analysis**

*Thirteenth Juror*

Tennessee Rule of Criminal Procedure 33 provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the *weight* of the

evidence." Tenn. R. Crim. P. 33(d) (emphasis added).[5]  Tennessee's courts have long referred to a trial court's role in independently assessing the weight of the evidence as that of the "thirteenth juror."  See, e.g., State v. Moats, 906 S.W.2d 431, 433 (Tenn. 1995); Cumberland Tel. & Tel. Co. v. Smithwick, 79 S.W. 803, 804 (Tenn. 1904).  Rule 33 is in stark contrast to Tennessee Rule of Criminal Procedure 29, which requires a trial court to "order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is *insufficient* to sustain a conviction of such offense or offenses."  Tenn. R. Crim. P. 29(b) (emphasis added).

After a jury convicts a criminal defendant, a trial or an appellate court's subsequent determination that the evidence was not sufficient to support the conviction "means that the government's case was so lacking that it should not have even been *submitted* to the jury." Burks v. United States, 437 U.S. 1, 16 (1978).  Thus, a court's reversal of a criminal defendant's conviction on the basis that the evidence was insufficient "has the same effect [as an acquittal] because it means that no rational factfinder could have voted to convict the defendant." Tibbs v. Florida, 457 U.S. 31, 41 (1982).  Principles of double jeopardy prevent the retrial of a defendant for a conviction reversed on grounds of insufficient evidence.  Id. at 42.

In contrast, a trial court's decision to reverse a defendant's conviction on the basis of the *weight* of the evidence does not prevent a retrial.  See id.  As the Supreme Court explained, when a trial court

> disagrees with a jury's resolution of *conflicting* evidence and concludes that a guilty verdict is against the weight of the evidence . . . [the trial court's decision] does not mean that acquittal was the only proper verdict.  Instead, the [trial] court sits as a "thirteenth juror" and disagrees with the jury's resolution of the *conflicting* testimony.  This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves.  A deadlocked jury . . . does not result in an acquittal barring retrial under the Double Jeopardy Clause.  Similarly, a[] [trial] court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.

Id. (emphases added) (footnote and citation omitted).

---

[5] In civil litigation, Tennessee Rule of Civil Procedure 59.06 also permits a trial court to grant a new trial when the jury verdict is contrary to the weight of the evidence.

One of Tennessee's former supreme court justices has explained the distinction between assessing the weight of the evidence and assessing the sufficiency of the evidence as follows:

> The distinction between the weight and the legal sufficiency of the evidence is one that our law has always recognized. Different considerations are present in each. In evaluating the legal sufficiency of the evidence, the judge determines whether all the necessary elements of the offense have been made out, whether the defendant's identity has been established and whether the proof demonstrates the existence of a valid defense. In doing so, the court is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn from the evidence. . . .

> An inquiry into the *weight* of the evidence is entirely different. The trial judge does not have to view the evidence in the light most favorable to the prosecution; he may weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses and the preponderance of the evidence. As the Eighth Circuit stated in United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980), even if the trial judge concludes that "despite the abstract sufficiency of the evidence to sustain the verdict, [that] the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [he] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Id. at 1319.

> Under Tennessee law, the thirteenth juror rule was long seen as the best safeguard against jury error. This rule may be the only safeguard available against a *miscarriage of justice by the jury*.

State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting) (second emphasis added).

As our intermediate appellate court has recognized, "[t]he reasons for bestowing the authority upon the trial court [to act as the thirteenth juror] lie in its ability to hear the testimony of witnesses, consider exhibits, reconcile *conflicting* evidence, and determine credibility." State v. Dankworth, 919 S.W.2d 52, 55 (Tenn. Crim. App. 1995) (emphasis

-10-

added).  Indeed, many years before the adoption of Rule 33, this Court asserted in the civil context that it

> attaches great weight to the fact that the circuit judge, having seen and heard the witnesses testify, and having submitted the case to a jury known to himself, has stamped the verdict with his approval by refusing to grant a new trial. Much of the importance and weight attached to jury trials proceeds from the presumption that an intelligent and learned circuit judge, accustomed to weighing evidence, has scrutinized the proof, looked into the faces of the witnesses, and indorsed the action of the jury.  The integrity and value of jury trial will largely disappear, if circuit judges shall endeavor to avoid the duty imposed upon them by law in this regard.

Tenn. Coal & R.R. v. Roddy, 5 S.W.286, 288 (Tenn. 1887).  We reiterated these concerns in Smithwick:

> The reasons given for the [thirteenth juror] rule are, in substance, that the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by [the judge's] training and experience in the weighing of testimony, and the application of legal rules thereto, [the judge] is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise – as it were, that of a thirteenth juror.  So it is said that [the judge] must be satisfied, as well as the jury; that it is [the judge's] duty to weigh the evidence, and, if [the judge] is dissatisfied with the verdict of the jury, [the judge] should set it aside.

79 S.W. at 804.

Weight and credibility, therefore, are inextricably linked.  The weight of a witness' testimony decreases as attacks on his or her credibility succeed.  As the Supreme Court of Ohio has recognized,

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.  It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the

issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

Ohio v. Thompkins, 678 N.E.2d 541, 546 (Ohio 1997) (quoting Black's Law Dictionary 1594 (6th ed. 1990)) (emphases added in Thompkins).

Given the importance accorded to a trial judge's independent assessment of the evidence supporting a criminal defendant's conviction, this Court has declared that "the trial court's approval of a criminal verdict as the thirteenth juror is a necessary prerequisite to the imposition of a valid judgment." Moats, 906 S.W.2d at 434; see also State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Thus, when a trial court in a criminal case fails to discharge its mandatory duty to act as the thirteenth juror, the sole remedy on appeal is reversal of the defendant's conviction(s) and a new trial. Moats, 906 S.W.2d at 435. Nevertheless, a criminal defendant's right to have the trial court sit as the thirteenth juror is not constitutional in nature. See State v. Johnson, 692 S.W.2d 412, 413-14 (Tenn. 1985) (declining to reinstate thirteenth juror rule after its abandonment in State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978)).[6]

*Successor Judge as Thirteenth Juror*

Tennessee Rule of Criminal Procedure 25 provides that, "[a]fter a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death, sickness, or other disability." Tenn. R. Crim. P. 25(b)(1). Moreover, "[t]he successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason." Id. at (b)(2).

As set forth above, when a jury convicts a criminal defendant, the trial court has a mandatory duty to assess the weight of the evidence in its role as thirteenth juror and determine whether to approve the jury's verdict. Occasionally, however, the trial judge is unable to discharge this obligation due to some intervening disability, and the duty will fall to a successor judge pursuant to Rule 25. Therefore, the successor judge must determine whether she can act as the thirteenth juror and independently assess and weigh the evidence adduced at trial, given that she did not preside at the trial and "look[] into the faces of the witnesses." Roddy, 5 S.W. at 288. If she determines that she cannot weigh the evidence as the thirteenth juror, she must grant a new trial. See State v. Biggs, 218 S.W.3d 643, 653-54 (Tenn. Crim. App. 2006).

---

[6] The thirteenth juror rule subsequently was restored through the adoption of Tennessee Rule of Criminal Procedure 33. See Carter, 896 S.W.2d at 121-22.

Thus, we arrive at the crux of one of the issues before us in this case: by what standards is a successor trial judge to determine whether she can fulfill an outstanding duty to act as the thirteenth juror in a criminal case?

Our Court of Criminal Appeals has opined that, "[g]iven the statements made by our supreme court regarding the purpose of the thirteenth juror rule, it is difficult to see how a trial judge who has not heard the evidence and who has not seen the witnesses can act as the thirteenth juror when weight and credibility are issues." State v. Brown, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000). Also, in State v. Nail, our intermediate appellate court reasoned that, in assessing whether he could act as the thirteenth juror, a successor judge "would need to determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict." 963 S.W.2d 761, 766 (Tenn. Crim. App. 1997) (citing State v. Bilbrey, 858 S.W.2d 911, 915 (Tenn. Crim. App. 1993) (Tipton, J., concurring). The court later opined that "[i]mplicit in the Nail ruling is that a judge whose first exposure to the case was presiding over the motion for new trial could rule on the motion if the record was available so long as witness credibility was not an overriding issue." State v. Gillon, 15 S.W.3d 492, 502 (Tenn. Crim. App. 1997). Stating the principle slightly differently, the court asserted in Biggs that, "[w]hen witness credibility is the primary issue raised in the motion for new trial, the successor judge may not approve the judgment and must grant a new trial." 218 S.W.3d at 654 (citing Brown, 53 S.W.3d at 275).[7] In an unreported Order addressing Rule 25, this Court cited with approval the Court of Criminal Appeals' construction of Rule 25 in Brown and Biggs. State v. Cobbins, No. E2012-00448-SC-R10-DD, at 2 (Tenn. May 24, 2012).

In the comparable civil context, our Court of Appeals has recognized that "a judge who does not see and hear the witnesses is at a significant disadvantage as thirteenth juror . . . especially . . . in a case . . . where the credibility of the witnesses is important." Arlie Overton v. Hilda Gay Lowe, No. E2007-00843-COA-R3-CV, 2009 WL 1871946, at *7 (Tenn. Ct. App. June 30, 2009). Indeed, in such cases, the Court of Appeals has opined that "absent strong indications [that the successor judge] still found a way to independently weigh the evidence we should set aside the judgment and order a new trial." Id.

Other jurisdictions that have utilized the thirteenth juror concept have focused similarly on the issue of witness credibility in determining whether a successor judge may act as the thirteenth juror. For instance, the Supreme Court of Arizona has recognized that

---

[7] We encourage trial and appellate courts to delineate carefully in ruling on a request for a new trial based upon the trial court acting as thirteenth juror under Rule 33(d), a request for a new trial on other grounds under other provisions of Rule 33, and a request for a judgment of acquittal under Rule 29.

"[t]he extent to which a judge who did not try the case can review the weight of the evidence is severely limited, essentially because a successor judge is in no position to pass on the credibility of witnesses whom he has not seen." Daru v. Martin, 363 P.2d 61, 64 (Ariz. 1961); see also Connelly v. United States, 249 F.2d 576, 580 (8th Cir. 1957) (recognizing that, where the credibility of the government's witnesses was a serious issue in a criminal case, a successor judge should not rule on a motion for new trial); Anderson v. Dewey, 350 P.2d 734, 737 (Idaho 1960) (holding that a successor judge may consider a motion for new trial in a case tried to the court where she "is not required to weigh conflicting evidence or pass upon the credibility of witnesses, but can resolve such issues . . . upon evidence which is not materially in conflict"); Jackson v. Commonwealth, 445 S.W.2d 835, 838-39 (Ky. 1969) (successor judge could rule on criminal defendant's motion for new trial because the grounds raised "were all matters which could be determined from the record"); Paulson v. Meinke, 352 N.W.2d 191, 193-94 (N.D. 1984) (adopting Anderson v. Dewey); Ruggieri v. Beauregard, 291 A.2d 413, 415 (R.I. 1972) (holding that the applicable rule of procedure "vests a successor judge with judicial discretion to review the jury verdict on a motion for new trial on the ground that such verdict was contrary to the weight of the evidence where the record clearly discloses that no question of the credibility of the witnesses or the weight to be given to their testimony will require resolution by him"); cf. Hunter v. Union State Bank, 505 N.W.2d 172, 175 (Iowa 1993) (successor judge could decide case tried to previous judge because "credibility was not that crucial"). But see Pinecrest, LLC v. Harris, 40 So. 3d 557, 563 (Miss. 2010) (reversing successor judge's vacating of original trial court's grant of new trial because original trial court "observed the entire trial, all witnesses, and the jury . . . [and] was . . . in the best place to judge the prejudicial effect of evidence and to judge whether any evidence led to bias, passion, and prejudice on the part of the jury . . . [such that original trial court] was in a far superior position to determine the necessity of a new trial"); Adkins v. Adkins, 539 N.E.2d 686, 692 (Ohio Ct. App. 1988) ("While it is always desirable to have the factfinder personally observe the witnesses whose credibility he or she is called upon to determine, considerations of judicial economy may weigh against the additional delay and expense represented by a new trial. [The relevant rule of civil procedure] leaves it to the [successor judge] to balance these factors along with any other relevant factors in exercising its discretion whether to order a new trial.").

The District Court of Appeal of Florida has followed a slightly different path. In Florida v. May, the court recognized that a successor judge in a criminal case being asked to reweigh the evidence "must review the basis for the motion and review the record to determine if" the motion required the resolution of conflicts in the evidence and a redetermination of witness credibility. 703 So. 2d 1097, 1100 (Fla. Dist. Ct. App. 1997). Then, "[i]f the motion rests on the determination of credibility or resolution of conflicts, the court should grant the new trial motion." Id. However, "[w]here credibility or conflicting evidence is not implicated, a trial judge who conscientiously reviews the record should be

*presumptively competent* to rule on the matters raised in a new trial motion." Id. (emphasis added).

Thus, the key factor for a successor judge to consider in her analysis of whether she can act as the thirteenth juror is the extent to which the credibility of one or more material witnesses is actually a significant aspect of the case. And, if witness credibility is a significant aspect of the case, to what extent can the successor judge determine credibility from the record?

Although the above-cited decisions focus on witness credibility, they do not focus on the specific factors that comprise a credibility determination. Our pattern jury instructions, however, offer excellent guidance about the several components of witness credibility. For instance, a trial court may instruct a jury about assessing witness credibility as follows:

> In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his or her *general character*, the evidence, if any, of the witness' *reputation for truth and veracity*, the *intelligence and respectability* of the witness, his or her *interest or lack of interest in the outcome of the trial*, his or her *feelings*, his or her *apparent fairness or bias*, his or her *means of knowledge*, the *reasonableness of his or her statements*, his or her *appearance and demeanor* while testifying, his or her *contradictory statements* as to material matters, if any are shown, and all the *evidence in the case tending to corroborate or to contradict* him or her.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.04 (18th ed. 2014) (emphases added).

Alternatively, a jury may be instructed as follows:

> It is your job to decide what the facts of this case are. You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness said. You are free to believe all, none, or part of any person's testimony.
>
> In deciding which testimony you believe, you should rely on your own common sense and everyday experience. There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions:

(1) Was the witness *able to see or hear clearly*? How long was the witness watching or listening? Was anything else going on that might have distracted the witness?

(2) Did the witness seem to have a *good memory*?

(3) How did the witness *look and act while testifying*? Did the witness seem to be making an honest effort to tell the truth, or did the witness seem to evade the questions?

(4) Has there been any evidence presented regarding the witness' *intelligence, respectability or reputation for truthfulness*?

(5) Does the witness have any *bias, prejudice, or personal interest* in how the case is decided?

(6) Have there been any *promises, threats, suggestions, or other influences* that affected how the witness testified?

(7) In general, does the witness have any *special reason to tell the truth, or any special reason to lie*?

(8) All in all, how *reasonable* does the witness's testimony seem when you think about all the other evidence in the case?

Sometimes the testimony of different witnesses will not agree, and you must decide which testimony you accept. You should think about whether the disagreement involves something important or not, and whether you think someone is lying or is simply mistaken. People see and hear things differently, and witnesses may testify honestly but simply be wrong about what they thought they saw or remembered. It is also a good idea to think about which testimony agrees best with the other evidence in the case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide the case. If so, you may choose not to accept anything that witness said. On the other hand, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.04(a) (18th ed. 2014) (brackets omitted) (emphases added). Finally, our pattern jury instructions offer a third alternative:

> In forming your opinion as to which witness you believe, you may consider the following factors:
>
> (1) How the witness *looked, acted*, and whether the witness *appeared* to you to be telling the truth when he or she testified;
>
> (2) Whether the witness was *in a position to know* about the matter to which he or she testified. In other words, how well could the witness see or hear what he or she testified he or she saw or heard;
>
> (3) Whether the witness' *statements were consistent* and how *believable* the statements were;
>
> (4) Whether the witness had a *motive* to testify truthfully or to testify untruthfully; and
>
> (5) Any proof presented of the witness' *reputation for telling the truth*.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.04(b) (18th ed. 2014) (emphases added).

A careful perusal of these instructions reveals that most of the specific credibility factors referred to may be evaluated from the transcript of the witness' testimony and the testimony of others about the witness, as well as from information that may be contained in trial exhibits. For instance, a witness' "reputation for truth and veracity" will be established by words about the witness. Similarly, a witness' "intelligence and respectability," her "interest," if any, in the outcome of the trial, her "feelings" about the case and/or the parties and/or other relevant persons including other witnesses, and her "apparent fairness or bias" are established primarily by her (or another's) testimony. A witness' means of knowledge likewise will be established through the words of the witness or through the words of another person. And, the reasonableness of a witness' statements and his or her contradictory statements, if any, are established through the witness' words. Indeed, even a witness' "general character" is established far more by the witness' own words or the words of others about the witness than by the manner in which the witness speaks those words. Conflicting or corroborating testimony and other proof, reflected in the record, also impacts credibility assessments.

Moreover, trial lawyers are skilled at impeaching witnesses by attempting to demonstrate bias and contradictions and inconsistencies during cross-examination. The success of these attempts frequently can be determined from the witness' testimony, including equivocation and evasive responses. For instance, a witness who is forthcoming and detailed during his testimony on direct examination may then answer questions on cross-examination with "I don't know" and "I don't recall," indicating some lack of trustworthiness.

Thus, most indications that a witness may be less than fully credible are readily apparent from the record of the trial. See United States v. Salahuddin, 765 F.3d 329, 346 (3d Cir. 2014) (trial court did not err in rejecting defendant's claim that jury's verdict was against the weight of the evidence because "the jury was made aware – through cross-examination, closing arguments, and the jury instructions – of [the witness'] motivations, potential bias, and inconsistent testimony" (footnote omitted)).

The foregoing discussion omits only a single component of witness credibility: demeanor. Witness demeanor has been defined variously. For instance, the Kansas Court of Appeals has defined demeanor as "[o]utward appearance or behavior" and demeanor evidence as "[t]he behavior and appearance of a witness on the witness stand." Kansas v. Leaper, 196 P.3d 949, 954 (Kan. Ct. App. 2008) (quoting Black's Law Dictionary 463, 596 (8th ed. 2004)), aff'd 238 P.3d 266 (Kan. 2010). A federal trial court has described demeanor as

> embrac[ing] such facts as the tone of voice in which a witness' statement is made, the hesitation or readiness with which his answers are given, the look of the witness, his carriage, his evidences of surprise, his gestures, his zeal, his bearing, his expression, his yawns, the use of his eyes, his furtive or meaning glances, or his shrugs, the pitch of his voice, his self-possession or embarrassment, his air of candor or seeming levity.

Norng v. Shalala, 885 F. Supp. 1199, 1221 (N.D. Iowa 1995) (quoting Black's Law Dictionary 430 (6th ed. 1990)) (internal quotation marks omitted).

Certainly, a transcript cannot capture much, if any, of a witness' appearance and demeanor while testifying. See Ohio v. Larry Beard, No. CA82-01-0013, 1983 WL 4395, at *3 (Ohio Ct. App. June 15, 1983) (noting that "[t]he printed record cannot convey the trial court's observation of the manner in which the [witness] conducted herself, [including] her demeanor"). Accordingly, numerous courts have acknowledged the significance of

observing and hearing a witness prior to assessing his or her credibility. For instance, the United States Court of Appeals for the Second Circuit has recognized that

> the carriage, behavior, bearing, manner and appearance of a witness – in short, his 'demeanor' – is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness . . . [because] this part of the evidence may have turned the scale.

Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir. 1952); see also, e.g., Ruggieri, 291 A.2d at 415 (resolving the question of a witness' credibility "would depend largely upon the observations of the witness testifying at trial"); In re Holt, 625 P.2d 398, 403 (Idaho 1981) (Bistline, J., dissenting) ("[T]he trial court both saw and heard the witnesses, observing their demeanor, apparent evasiveness, nuances, and the many things which are said to tell the trier of fact that the witness is or is not sincere, honest and worthy of belief."); People v. Lemmon, 576 N.W.2d 129, 138-39 (Mich. 1998) ("The credibility of a witness is determined by more than words and includes tonal quality, volume, speech patterns, and demeanor, all giving clues to the factfinder regarding whether a witness is telling the truth.") (citing Wisconsin v. Turner, 521 N.W.2d 148 (Wis. Ct. App. 1994)).

Although the Supreme Court has recognized that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said," nevertheless,

> factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.

Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). Corroborating evidence may also render a witness' demeanor less significant to assessing his or her credibility. See Carbo v. United States, 314 F.2d 718, 750 (9th Cir. 1963) (stating that corroborating evidence "placed the government's case safely beyond demeanor impeachment"); Bilbrey, 858 S.W.2d at 915 (Tipton, J., concurring) (stating that demeanor becomes less important in direct proportion to the strength of the corroborating evidence).

Placing this issue in context, then, the cold record of a trial generally will reflect all but one of the components that comprise the credibility of the State's witnesses. Thus,

because these aspects of witness credibility are contained in the record, a successor judge can evaluate them in weighing the evidence. Only if the record justifies the successor judge in concluding that witness *demeanor* was a crucial aspect of the case should the successor judge determine that he cannot independently weigh the evidence. See Bilbrey, 858 S.W.2d at 915 (Tipton, J., concurring) (stating that successor judge could not act as thirteenth juror because critical witness' demeanor on the witness stand was significant in assessing his credibility). In this regard, we agree with the Carbo court:

> Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence. . . . The inquiry then would seem to be as to how importantly demeanor appears to loom in making the necessary credibility determinations.

Carbo, 314 F.2d at 749; see also FDIC v. Siraco, 174 F.2d 360, 363-64 (2d Cir. 1949) (providing that demeanor was decisive factor when witnesses' story was inherently suspicious).

Witness demeanor is not always of crucial importance in a trial. See, e.g., Carter v. Newsday, Inc., 528 F. Supp. 1187, 1195 (E.D.N.Y. 1981) ("There was no credibility issue, because there was no conflict in the versions of both witnesses as to what they did."); Willis v. Allen, 373 S.E.2d 79, 81 (Ga. Ct. App. 1988) ("An issue of credibility is not raised where there is no conflicting or contradictory evidence on a material matter or impeachment, or inherent discredit."). If it was, no successor judge could act as the thirteenth juror. Clearly, our rules of criminal procedure contemplate that a successor judge *may* act as the thirteenth juror. Moreover, we presume that witnesses testify truthfully, and we instruct our juries accordingly. See Lundy v. State, 752 S.W.2d 98, 103-04 (Tenn. Crim. App. 1987); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.04 (18th ed. 2014).

It is apparent, then, that the significance of a witness' demeanor to assessing her credibility increases in direct correlation with the significance of the attacks on the other aspects of her credibility. The classic example of witness demeanor being of utmost importance in a case is the "she said, he said" trial in which the victim testifies that the defendant committed a crime against her, and the defendant testifies that he did not commit the alleged crime. The proof in such cases is not merely inconsistent but is directly contradictory. Absent significant proof establishing that one or the other witness was simply lying,[8] the witnesses' demeanor would be a crucial component of evaluating their respective veracity. In such a case, a successor judge would be unable to independently assess the

---

[8] In this context, "significant proof" could be, for instance, DNA proof.

-20-

weight of the evidence.  See, e.g., Biggs, 218 S.W.3d at 655 (holding that successor judge could not act as thirteenth juror because the "case involved accusations by the victim and her parents and a denial of any wrongdoing by the defendant, with no physical evidence present. Witness credibility was an overriding issue . . . .").

Most cases are not so straightforward.  Moreover, most cases will allow a successor judge to evaluate the weight of the evidence because most cases will not depend so heavily upon witness demeanor *alone* as the determining factor of witness credibility.  We reiterate that *most* components of witness credibility may be determined from the record.  Stated another way, the argument that a successor judge is unable to rule as the thirteenth juror presumes that the witnesses' demeanor on the stand was so significant *in and of itself* as to raise a concern that the jury's verdict was a "miscarriage of justice."  We are not persuaded to adopt this approach.  See Willis, 373 S.E.2d at 81 (recognizing that "[t]he argument that the nature of the witnesses' testimony and their relationship to each other in this case *itself* creates an issue of fact as to its credibility is not legally sound").

Accordingly, we hold that a successor judge should carefully review the entire record of the trial with the goal of determining the extent to which the critical testimony of material witnesses was contradicted and/or impeached and/or inherently unbelievable.  Critical testimony is testimony that supports the State's case, particularly testimony that establishes the defendant's identity and the elements of the crime(s) for which the defendant is being prosecuted.  If this testimony does not appear to have been significantly discredited, either through cross-examination or through the presentation of other proof,[9] then the successor judge should consider herself capable of acting as the thirteenth juror.

If, however, the State's critical testimony was subjected to significant attack, then the successor judge must consider the extent to which she can determine witness credibility from the record.  As set forth above, a witness' credibility may be determined, in large part, from a careful review of the record.  Only if the successor judge determines that one or more material witnesses' *demeanor* is critical to assessing the weight of the State's case should the successor judge decline to undertake the role of thirteenth juror.  Such cases are rare.  Indeed, successor judges very seldom should be called upon to undertake the role of thirteenth juror.

---

[9] We do not imply that the defense has any obligation to present proof.  However, even in those cases in which the defense presents no witnesses, the defense can be expected to attack the credibility of the State's witnesses whenever such an attack may help the jury to develop a reasonable doubt about the State's case. Moreover, such attacks will assist the defense, if necessary, in later arguing to the trial court that the weight of the evidence is against the jury's verdict.  At least one court has recognized "the narrow principle that a party may allude to, during [closing] argument, the demeanor of a *testifying* witness if the jury had the same opportunity to observe the demeanor during the witness' testimony." Good v. State, 723 S.W.2d 734, 736 (Tex. Crim. App. 1986) (en banc).

-21-

This is true because the judge who presides at trial should explicitly approve or disapprove the verdict as thirteenth juror promptly after the jury renders its verdict. If the trial judge disapproves the verdict, he or she may excuse the jury before announcing that decision.[10]

In sum, we hold that a successor judge should indulge a rebuttable presumption that she is able to act as the thirteenth juror in a criminal case after thoroughly reviewing the entire record of the trial. See May, 703 So. 2d at 1100. This presumption will protect the jury's verdict by lessening the possibility that a successor judge will grant a new trial on the basis that he or she cannot act as the thirteenth juror. Only if the record indicates that weighing the evidence would require an assessment of witness *demeanor* should the successor judge decline to act as the thirteenth juror. Additionally, to facilitate appellate review, if the successor judge determines that she cannot act as the thirteenth juror, she should place on the record her reasons for concluding that the presumption is rebutted.

*Standard of Review*

Neither this Court nor the Court of Criminal Appeals has addressed specifically the standard of review an appellate court should utilize in reviewing a successor judge's determination that he can or cannot act as the thirteenth juror. In the instant case, the majority of the Court of Criminal Appeals appeared to rely on a de novo review. The dissenting judge referred specifically to a review for abuse of discretion.

Rule 25 provides that a successor judge "*may* grant a new trial" when he concludes that he cannot complete the duties that arise after a guilty verdict. Tenn. R. Crim. P. 25(b)(2) (emphasis added). Those duties include, but are not limited to, the obligation to act as the thirteenth juror. Other post-verdict obligations may include sentencing the defendant as well as conducting hearings on other post-verdict proceedings such as a motion to arrest judgment. See Tenn. R. Crim. P. 34. Because the grant of a new trial would not be appropriate in the event the successor judge concluded that he could not conduct, for instance, the sentencing hearing, Rule 25 employs the term "may."

While this use of the term "may" indicates that it is within the successor judge's discretion whether to grant a new trial, a successor judge *must* decide whether to act as the thirteenth juror if the original trial judge did not. That decision is mandatory, not

_____

[10] While we discourage trial judges from waiting to rule as the thirteenth juror until the hearing on a motion for new trial, we acknowledge that a trial judge who tried the case may change his or her mind about the weight of the evidence upon further reflection and hearing argument at the motion for new trial hearing. Under those particular circumstances, the initial trial judge is not precluded from reversing his or her initial ruling.

discretionary. See Nail, 963 S.W.2d at 765; see also Carter, 896 S.W.2d at 120 (holding that Rule 33's thirteenth juror provision "is mandatory and requires a trial judge to act as the thirteenth juror"). That mandatory decision is the decision we are called upon to review in this case.

Our analysis of Rule 25 in the preceding section makes clear that a successor judge's determination about acting as the thirteenth juror involves both an analysis of the proof adduced at trial, including the extent to which witness demeanor was at issue, and a legal conclusion about the ability of the successor judge to act as the thirteenth juror. It is well-settled that this Court reviews de novo a trial court's conclusions of law. See, e.g., State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005); State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

As to the successor judge's analysis of the trial record, this Court is in the same position to evaluate the transcript and exhibits as is the successor judge. See, e.g., Krick v. City of Lawrenceburg, 945 S.W.2d 709, 712 (Tenn. 1997) (recognizing that appellate court is in same position as trial court to assess evidence when all of the proof is contained in the record by deposition). Accordingly, a de novo review of the successor judge's analysis of the trial record is appropriate. See id.

Accordingly, we hold that an appellate court should review a successor judge's decision about whether he can act as the thirteenth juror under a de novo standard of review. Accord Kornberg v. Kornberg, 542 N.W.2d 379, 384 (Minn. 1996) (applying de novo standard of review regarding a successor judge's authority to perform judicial duties because the extent of that authority is a question of law).

*Application*

In this case, the defense argued at the motion for new trial hearing that the case hinged on issues of credibility and that, therefore, the successor judge should not act as the thirteenth juror. However, the successor judge determined that he could act as the thirteenth juror in large part because there were no significant conflicts in the evidence on material matters. Applying the presumption in favor of a successor judge acting as the thirteenth juror, and upon our de novo review, we agree that the successor judge in this case should have acted as the thirteenth juror.

First, the defense admitted that the Defendant committed the theft of items belonging to the victims and admitted that the Defendant stole these items from the victims' residence. Thus, the only "live" issue for the jury's consideration was whether the Defendant broke into

the House while the victims were there and then took their property from their presence by use of a handgun.

Second, as the summary of the trial transcript provided above indicates, the victims' testimony about the elements of the crimes was not contradicted in any significant manner. Additionally, Officer Lawson testified that the door of the House was "damaged" and that the frame around the strike plate was cracked. This testimony corroborated Cobb's testimony that the Defendant forced open the door. There was no proof that the Defendant gained entry into the House in some other manner.[11]

As to the Defendant's threatening the victims with a gun, the defense established that both victims refused to accede to the Defendant's demands that they remove their clothing. However, Cobb explained that his refusal resulted from his being "so scared" that he did not know what to do. Greene also testified that she was frightened of the Defendant and explained that, when she refused to take her clothing off, the Defendant then left her alone.

The defense also established some discrepancies in Greene's reports about what the Defendant had been wearing during the incident and that Cobb called Woodruff before Greene called 911. Although the defense attacked the victims' credibility both in its opening statement and closing argument, the defense did not establish, through cross-examination or otherwise, that the victims' overall credibility was subject to significant doubt. We decline to assume that the victims' *demeanor* on the witness stand was such as to render their credibility suspect to the trial judge, in spite of their obvious credibility to twelve lay jurors, such that the successor judge could not accurately assess the weight of the evidence as reflected in the record. Thus, the record does not rebut the presumption that the successor judge could act as the thirteenth juror in this case.

In sum, we conclude that the successor judge in this case correctly determined that he could perform the function of the thirteenth juror and that he independently could weigh and assess the evidence adduced at the Defendant's trial so as to prevent a miscarriage of justice by the jury.[12] Accordingly, we hold that the Defendant is entitled to no relief on the basis that the successor judge acted as the thirteenth juror.

---

[11] We reiterate that the defense has no obligation to present proof.

[12] We do not review the successor judge's decision that the weight of the evidence supported the jury's verdicts. See Dankworth, 919 S.W.2d at 59 (recognizing that the duty of an appellate court is limited to reviewing whether a trial court performed its obligation as the thirteenth juror and does not include reweighing or reassessing the evidence).

**Conclusion**

For the reasons set forth above, we reverse the judgment of the Court of Criminal Appeals and reinstate the judgments of the trial court. It appearing that the Defendant is indigent, the costs of this cause are taxed to the State of Tennessee.

_____
JEFFREY S. BIVINS, JUSTICE