IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 19, 2017 Session

**STATE OF TENNESSEE v. DAVID BRIAN HOWARD**

**Appeal from the Circuit Court for Giles County**
**No. 12576    David L. Allen, Judge**

_____

**No. M2016-02256-CCA-R3-CD**

_____

The Defendant, David Brian Howard, was convicted by a jury of aggravated assault, a Class C felony, and received a three-year sentence, to be served on probation. The Defendant appeals, asserting that the evidence is insufficient to uphold the verdict due to perjured testimony; that the trial court improperly refused to function as thirteenth juror to overturn his conviction; that the trial court erred in not excusing a juror who made a statement during the trial regarding defense counsel's questions to a witness; and that the trial court improperly admitted evidence during sentencing regarding an offense of which the Defendant was acquitted. After a thorough review of the record, we affirm judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

A. Colbrook Baddour, Pulaski, Tennessee, for the appellant, David Brian Howard.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Brent A. Cooper, District Attorney General; and Matthew Stephens and Rachel Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant was embroiled in a property line dispute with the victim, Mr. Randall Scott Hickman, and the victim's family. In the course of a confrontation, the

Defendant pointed a gun at the victim, an act which was captured on video. At trial, the Defendant sought to establish that he acted in self-defense.

The State presented the testimony of several witnesses who had been assisting the victim in erecting a fence at the time of the confrontation. The victim testified that at the time of the assault on June 14, 2014, he had only lived in his home for a few months and that the Defendant and his wife lived in the neighboring house. The victim, who worked as a truck driver, had hired Mr. John Dale to put in a fence along the disputed property line, and the victim arranged for his wife's two teenage sons, Mr. Justin Gray and Mr. Lee Medley, to assist Mr. Dale in driving fence posts into the ground. Ms. Leslie[1] Travis and Ms. Shannon Brown were also present on the property.

The victim and his wife, Ms. Wanda Diane Hickman, were inside the house while Mr. Dale, Mr. Gray, and Mr. Medley worked on the fence. The victim became aware of the dispute when Ms. Brown came in to ask Ms. Hickman to come outside. The victim heard a commotion and went outside, where he saw the Defendant holding one of the fence posts that had been put in, rocking it back and forth to try to dislodge it. The victim testified that Ms. Hickman was also holding the fence post, trying to interfere with the Defendant's actions. The victim "reached through the crowd and grabbed a hold of the fence post and told them we didn't want to do this." At that point, the Defendant pointed a gun at the victim's face from approximately eighteen to twenty inches away. The victim testified that he was afraid. The Defendant backed up and then lowered the weapon. Meanwhile, the Defendant's wife and Ms. Hickman had begun arguing. The Defendant's wife was yelling in Ms. Hickman's face, and Ms. Hickman "popped her in the mouth." The Defendant proceeded to point the gun at Ms. Hickman from about ten feet away. The victim started toward the Defendant and reached for the gun, and the Defendant again pointed the gun at the victim. The police were then summoned.

On cross-examination, the victim agreed that he had initially testified that he grabbed the fence post, but he acknowledged that this was not true. The victim stated, "I guess I touched his hand." He clarified, "Well, I did touch the fence post, too, but I guess I put my hand on his hand[;] I pulled it off the fence post." He also acknowledged that in his statement to the police, he had written that he had pulled the Defendant's hand off the post and that the statement did not assert that he touched the post. He agreed that he had previously testified that he touched the post before admitting on cross-examination that he pulled the Defendant's hands off the post.[2] The victim stated, "I guess I was lying,"

---

[1] Ms. Travis's first name was given as "Ashley" by the victim's wife.

[2] Apparently, this testimony was given in a previous trial which, for reasons not contained in the record, ended in mistrial.

and agreed that he lied again when he said during trial that he grabbed the post, but he ultimately explained, "[I]t is not a problem of me not telling the truth, it's just miswording." When the victim removed the Defendant's hand, the Defendant said, "[D]on't f'ing touch me" and jerked his hand away. The victim stated that both his family and the Defendant's family previously had called the police numerous times about disagreements over the property line. He acknowledged that there were signs in his yard but stated he did not put them up or recall what they said because he was frequently on the road as a truck driver.

The victim identified a video of the incident, which Mr. Gray had recorded on his telephone. The victim testified that the video did not capture the initial struggle over the fence post or the first time that the Defendant pointed the gun at his head but began recording shortly before Ms. Hickman struck the Defendant's wife. The video shows the Defendant holding a gun, the participants in the confrontation making crude taunts at one another, Ms. Hickman hitting the Defendant's wife, and the Defendant raising the gun and pointing it.

The State introduced photographs from a game camera on the victim's property which had captured still images from the confrontation. The victim testified that the camera had been placed there because the Defendant had twice before removed fence posts that the victim's family had placed on the property line. He testified that the camera would activate when it detected motion and that he gave a deputy the card which contained the pictures. He did not look at or delete the photographs prior to the time police arrived.

Ms. Hickman testified that she had hired Mr. Dale to put up a fence and that her two sons and the victim intended to assist Mr. Dale. While Ms. Hickman and the victim were inside, Ms. Brown alerted Ms. Hickman that the Defendant was cursing at the workers. Ms. Hickman observed the Defendant come out of his home wearing gloves, and he began to try to loosen a fence post. The Defendant had removed a previous fence. Ms. Hickman grabbed the top of the post the Defendant was holding, and the victim "put his hand on top of that fence and told him, '[L]et's don't do this.'" At that point, the Defendant drew a gun and put it in the victim's face. He pointed it at Ms. Hickman and started waving the gun around. The victim tried to get the gun from the Defendant, but "he never touched [the Defendant]." Ms. Hickman stated that she was so focused on the gun that she did not recall hitting the Defendant's wife but, having watched the video, she acknowledged that she had hit her. Ms. Hickman had pled guilty to assault and was serving probation.

Ms. Hickman acknowledged that both her family and the Defendant's family had contacted police numerous times regarding disputes. She stated she had put a sign in her

yard facing the Defendant's property which said "God is good" and another sign which informed the Defendant that she had gone to a yard sale on Minor Hill and had had a great time with her friends. She explained that the impetus for the signs was the fact that the Defendant had installed a security camera facing her property and that she felt that he was spying on her. She also stated that Ms. Travis had put a sign in Ms. Hickman's yard that said something to the effect of "redneck – I don't know how she put it. Red recognize." This sign was illegible, and Ms. Hickman's response on seeing it was, "[W]hy? Why?" Ms. Hickman agreed that her family owned a red pickup truck and that at the time, it was habitually parked at her house. She did not recall any bumper stickers on her truck, which was parked "on another two acres."

Ms. Hickman reiterated that the victim did not touch the Defendant, noting that the Defendant's hands were at the bottom of the post, Ms. Hickman's hands were above the Defendant's, and the victim's hands were above Ms. Hickman's hands, which acted as a buffer between the men. She further stated that she and the victim were divorcing and that she would not willingly lie for him. The Defendant, who was acting "like a banty rooster," also pointed the gun at her. She stated that even though the gun was pointed at her, she did not retreat inside the house.

Mr. Gray testified that the Defendant began to curse at them when he saw that they were driving in fence posts. The Defendant returned to his house but came back out, at which point Mr. Gray went to get Ms. Hickman from the house. Mr. Gray testified that the Defendant and Ms. Hickman were struggling with the post when the victim came out and "put his hand on top of the fence post" and said, "'[L]et's not do this.'" The Defendant pulled out his weapon and pointed it "at all of us but mostly in [the victim's] face." The Defendant's wife was cursing at Ms. Hickman and crossed the property line, and Ms. Hickman struck her. Mr. Gray recorded part of the confrontation on his telephone, and he sent the video to law enforcement through email. On cross-examination, Mr. Gray reiterated that the victim grabbed the fence post and not the Defendant's hands but acknowledged that he did not see the entire interaction. He denied altering the video he sent to law enforcement and stated that police watched the video on his telephone at the scene. He acknowledged that the video did not record the entire incident. He also acknowledged that he was mocking the Defendant's wife even after the gun was drawn and that he said, "[S]mack the F out of the B." He did not recall saying to the Defendant that crazy people should not have guns, and he denied coordinating his story with his family members prior to the arrival of the police.

Mr. Dale testified that he used the surveyor's stakes as guidelines to install the fence and that he put the fence posts approximately one foot from the property line, on the Hickmans' property. When he and Ms. Hickman's sons were driving in a post across from the Defendant's deck, the Defendant began to curse at them and said he would tear

- 4 -

up the fence. Mr. Dale informed the Defendant that the fence was a temporary one, and the Defendant went back into his home. The Defendant again exited his home and began arguing, and Mr. Dale told Ms. Hickman's sons to continue with the work. The Defendant then began to wiggle one of the posts that had already been installed in order to remove it. Ms. Hickman came out and put her hands on the post above the Defendant's hands, and they argued. The victim then put his hands on top of the post and told them to stop. The Defendant produced a gun and pointed it at the victim, and everyone backed up. The victim reached for the gun, and the Defendant waved it at the others assembled outside. Mr. Dale testified that he turned sideways in order to try to make himself a smaller target. Ms. Hickman hit the Defendant's wife when the Defendant's wife made "kind of a charge" at Ms. Hickman.

On cross-examination, Mr. Dale testified that he had changed the angle of the game camera a few days earlier but did not remember if he changed the angle the day of the assault. When shown pictures from the game camera, he acknowledged that the pictures reflected a change in angle during the confrontation and showed Mr. Dale walking away from the camera's viewpoint. Mr. Dale stated he had not testified to changing the angle because it was not included in his statement to the police, which he had used to refresh his memory for trial, and because the incident had happened more than a year prior to the trial. He testified that the camera was moved because the confrontation was getting heated. He denied telling the Defendant that "mental people aren't supposed to have a gun and we're going to take that away from you." Mr. Dale was "[p]retty sure" that the victim did not touch the Defendant. Mr. Dale acknowledged that he was not present in some of the still pictures of the confrontation and that he was a "significant distance" from the altercation in some photographs. He speculated that some of these were taken after the police were summoned.

Deputy Matt King of the Giles County Sheriff's Department arrived at the scene and interviewed the witnesses at the Hickman home. He then interviewed the Defendant and his wife. The Defendant stated that he was "in fear of being pulled across the property line and not knowing what they were going to do to him." From prior calls to the residence, Deputy King knew that the Defendant had a video surveillance system and asked to see it. The Defendant told him it was not recording. When Deputy King stated he wanted to see the system anyway, the Defendant showed him a monitor with a graph summarizing the operation of the system. This graph contained periods of time which were shaded black or gray to indicate lapses in recording. When Deputy King looked at the time of the incident, there was a "larger area that was blocked out and it was the whole entire time frame of the incident." He left the Defendant and his wife forms to allow them to make written statements, and he picked up the forms at a later time. Deputy King charged Ms. Hickman with assault and the Defendant with aggravated

assault, and he collected the Defendant's weapon, which was loaded with a round in the chamber.

Deputy King testified that he did not know why the surveillance system did not record, but he stated that the other lapses in the system appeared to be smaller than the lapse which encompassed the assaults. He testified that the game camera was motion activated and he could not explain the intervals at which it took pictures. He did not know how Mr. Gray's video recording was collected, but he testified that he viewed the recording on Mr. Gray's telephone and that it was the same as the recording introduced at trial. Deputy King further testified that all of the witnesses at the Hickman house told him that the victim had put his hands only on the post. The victim's oral statement differed from his written statement, in which he stated he grabbed the Defendant's hand. Deputy King affirmed that the Defendant stated he was grabbed and pulled and was in fear when he produced the gun. Defense counsel then asked Deputy King several questions regarding whether he found it "odd" that the witnesses from the Hickman home all stated that the victim did not touch the Defendant but that the victim had testified that he did grab the Defendant.

The State then rested its case and the trial court decided to allow the jurors to take a break. The following exchange then occurred:

> JUROR []: How much longer is this going to take?
>
> THE COURT: I don't know. Let me ask you. Thank you. Are there time constraints that you are dealing with…?
>
> JUROR []: No.
>
> THE COURT: Okay. Good.
>
> JUROR []: He keeps asking the same thing over and over 40 different ways.
>
> THE COURT: Right. Yes. That -- I think the answer to your question is, within certainly a reasonable amount of time. Good. Thank you. Good.

The jury was excused, and the trial court asked the parties whether there were "any motions or anything we need to take up at this point." After the trial court denied a motion for acquittal, the defense presented proof.

The Defendant testified that he had severe spinal stenosis and received disability payments. In January 2014, the Defendant had surgery on his neck during which cadaver bone was inserted into his vertebrae and fused with screws. The Defendant was instructed that he should avoid turning his neck, falling, or otherwise jarring the area during recovery. In April, the Defendant fell, injuring the area, and he had to begin the recovery process again. Doctors told him that if the hardware holding the bones in place were to break, he could become paralyzed. The Defendant testified that he was not, however, prohibited from jiggling fence posts because that activity did not involve his neck. The Defendant had a permit to carry his handgun and carried it "[a]ll the time," including when he was mowing the lawn or shopping for groceries. The victim and his family also carried guns.

The Defendant confirmed that he had a property dispute with his neighbors. He stated that the victim's family had a bumper sticker on the hood of their truck that read "D Howard the coward" and that they had put up signs in their yard, including one about a yard sale and one that said "redneck c***s," spelled with a "k." The Defendant had called the police on prior occasions regarding the victim's attempts to build a fence, and the police had declined to intervene because they believed the dispute was a civil issue. The Defendant had pulled up the fence posts on these prior occasions.

On June 14, 2014, the Hickmans began to erect a fence for the fourth time on the disputed land. The Defendant heard dogs barking and put a gun in his waistband and went outside. He saw approximately eight people driving in fence posts, and he told them that he would simply pull them up later. One of Ms. Hickman's sons said, "[W]hy don't you pull them out now[?]" The Defendant put on shoes and gloves in the house, went out, and began to try to dislodge one of the posts. Ms. Hickman also grabbed the post the Defendant was trying to dislodge and began to argue with the Defendant's wife. The Defendant heard Mr. Dale say, "[M]ental people aren't supposed to own a gun," and "[W]e are going to see to it that you get that taken away."

The Defendant testified that as they were pulling on the post, the victim approached, "coming to me fast" and told him, "[Y]ou don't want to do that" in an aggressive manner. The Defendant felt this was a threat. The victim grabbed the Defendant's left arm at the wrist and started to pull the Defendant toward the victim. The Defendant testified, "And then I thought we was going for my gun." The Defendant stated he was afraid that the victim's pulling him would injure his neck and result in paralysis. The Defendant testified he drew his gun and then told the victim to let him go. The Defendant backed up and put the gun "to the ground." He heard his wife "get hit" and he brought up the gun again. The victim then charged him, trying to grab the gun, and the Defendant "turned the gun" from Ms. Hickman. The Defendant acknowledged that this was captured on the video. The Defendant testified that when the victim

charged, he thought the victim would tackle him. The Defendant then called the police, acknowledging to them that he had brandished a weapon. The Defendant testified that he never took the safety off the gun and that he had never crossed into the victim's property except when the victim pulled him over the line.

The Defendant acknowledged that each of the previous three times he removed the fence, he had personally removed fifteen posts. He denied cursing at the victim's family prior to the confrontation. He acknowledged that his statement to police did not include Mr. Dale's alleged statement about taking away his gun, and he agreed that he was able to fill out his statement to police at his own home without supervision from law enforcement. He also agreed that he was the only person who had a gun that day and that he was the only person who pointed a gun. The Defendant at first testified that he did not show Deputy King any small gaps on his surveillance system, but then he clarified that the gaps were large and that the time period of the incident was not the only large gap. He denied deleting the footage from his security system.

The jury convicted the Defendant of aggravated assault as charged. At the sentencing hearing, Deputy King testified that there were close to twenty-five complaints on file at the sheriff's department regarding the property dispute between the neighbors, and that both parties had lodged complaints. Deputy King also testified that in 2012, the Defendant had been charged with aggravated assault in an incident involving the same gun. The Defendant was acquitted by a jury. The defense objected to this evidence, and the trial court agreed it was not admissible as a prior conviction but ruled that it could be considered as part of the Defendant's previous criminal behavior.

Officer Alicia Helton, who prepared the Defendant's presentence report, testified that the Defendant had been under treatment for depression since 2009 and took four prescription medications to treat his mental health. The Defendant suffered from diabetes, high blood pressure, stage three kidney failure, severe spinal stenosis, and shoulder pain, and he underwent a quadruple bypass in 2009. He was currently taking ten prescription medications to treat his physical illnesses. She testified that she received a victim impact statement filled out by the victim's wife and signed by the victim, but she acknowledged that the two signatures looked similar. The Defendant in allocution told the court that he had been in fear for his life when he drew his weapon.

The trial court found as an enhancement factor that the crime involved more than one victim and as mitigating factors that the Defendant acted under duress and that substantial grounds existed tending to excuse or justify the conduct. T.C.A. §§ 40-35-114(3); 40-35-113(3), (12). In making these findings, the trial court noted, "I believe the defendant honestly believed he was in danger and at risk when he pulled the weapon. That does not justify it but I think it does create a factor for the Court to consider…."

The trial court considered the Defendant's request for judicial diversion and ultimately denied diversion, instead sentencing the Defendant to three years of probation. The trial court reiterated that it found as the thirteenth juror that the Defendant had committed the crime, and it concluded that diversion should be denied:

> And I think that the primary reason I have done that may be your salvation. Your judgment was extremely bad. Do I believe you thought you were provoked, do I believe you thought your conduct was reasonable and justified? I think you thought that. That does not make it reasonable or justified, but I honestly believe you felt you and your family were at risk. By denying judicial diversion and affirming the felony conviction, you will lose your right to vote, and perhaps the most painful part of your sentence to you, you will lose the right to possess and own a firearm, which will keep you from having such bad judgment. It will keep you from committing an offense of this nature again.

The Defendant appeals, asserting that the evidence was insufficient because the victim committed perjury; that the trial court's findings at sentencing were inconsistent with approving the verdict as thirteenth juror; that the trial court erred in not dismissing the juror who commented on the defense's questions during the trial; and that the trial court should not have admitted evidence at sentencing regarding the Defendant's prior trial and acquittal.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that his conviction must be overturned because the victim presented perjured evidence regarding whether he grabbed the Defendant prior to the assault.

This court must set aside a conviction if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions

concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). On review, "[t]his Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

The Defendant does not argue that the elements of the aggravated assault were not established; instead, he asserts that the victim's inconsistent testimony regarding whether he grabbed the Defendant requires the conviction to be overturned because it establishes reasonable doubt as to whether the Defendant was acting in self-defense.[3]

In order for the Defendant to be convicted of aggravated assault, the State had to show that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury and that the assault involved the use or display of a deadly weapon. T.C.A. §§ 39-13-102(a)(1)(A)(iii) (Supp. 2013); 39-13-101(a)(2) (Supp. 2013).

The jury was also instructed on self-defense and defense of another. The burden of negating self-defense beyond a reasonable doubt lies with the State. *Id.* §§ 39-11-201(a)(3), 39-11-203(d). Whether a defendant was acting in self-defense is a question of fact for the jury. *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012). As part of this determination, the jury must determine the reasonableness of the defendant's belief that force was required to protect against imminent danger. *State v. Pruitt*, 510 S.W.3d 398, 420 (Tenn. 2016) (concluding that the jury's determination encompasses "'whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault'" (quoting *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995)).

The jury was charged with self-defense, self-defense using deadly force, and defense of another. The statute regarding self-defense states:

---

[3] The Defendant's brief argues that the "weight and credibility of the State's evidence was insufficient to sustain a finding of guilt." While the Defendant also makes a passing reference to due process regarding the alleged perjury, the Defendant cites to no authority regarding a due process violation. We do not address the due process argument, as it has not been sufficiently raised. *See* Tenn. Ct. Crim. App. R. 10(b).

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

T.C.A. § 39-11-611(b)(1) (Supp. 2012). Likewise,

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

*Id*. § 39-11-611(b)(2) (Supp. 2012). And finally, the State had to negate the defense of defense of another:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

*Id*. § 39-11-612. All three statutory provisions require a reasonable belief that the defendant's use of force is necessary to protect the defendant or a third person.

- 11 -

At trial, Ms. Hickman and Mr. Gray testified that the victim never touched the Defendant. Mr. Dale testified that he did not see the victim grab the Defendant. The victim testified that he grabbed the fence post, but later acknowledged that he grabbed the Defendant's hand. While the victim agreed with the defense that he had lied, he clarified that "it is not a problem of me not telling the truth, it's just miswording." The Defendant testified that the victim grabbed him and pulled him and that he believed he needed to draw his weapon in order to prevent an injury that could result in paralysis. The victim testified that he was in fear, and all the witnesses agreed that the Defendant pointed the weapon at the victim.

We conclude that the evidence is sufficient for a rational trier of fact to conclude that the elements of aggravated assault were established beyond a reasonable doubt. The proof is overwhelming that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury by pointing a gun at him. Furthermore, there is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the Defendant was not acting in self-defense or defense of another. First, we note that the testimony which was ultimately put before the jury from the victim was that the victim did grab the Defendant, and the jury was able to assess the credibility of the victim's prior testimony that his hand was merely on the post. The Defendant does not contend that the victim's testimony that he grabbed the Defendant was false, and this was the testimony ultimately vouchsafed to the jury as the truth, with the victim explaining that his previous statement that he grabbed the post was "miswording." *See, e.g., State v. Dwight Johnson*, No. 03C01-9301-CR-00022, 1994 WL 377130, at *3 (Tenn. Crim. App. July 13, 1994) ("An allegation that a witness previously made a statement inconsistent with her trial testimony is not sufficient to sustain a charge of perjury.").

Moreover, the jury was charged not only with determining if the victim had grabbed the Defendant but also with determining the reasonableness of the Defendant's belief that his use of force was necessary. Although the Defendant testified that he had an honestly held belief that he was in imminent danger of serious bodily injury, the jury, even if it credited the testimony that the belief was honest, was free to conclude that this belief was not reasonable. We cannot conclude that evidence that the victim grabbed the Defendant's wrist would as a matter of law raise reasonable doubt regarding whether the Defendant were acting in self-defense by pointing a gun at the victim's head. *See State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). Because "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact," we cannot revisit the jury's determination on appeal. *Bland*, 958 S.W.2d at 659. Because a rational trier of fact could have found beyond a reasonable doubt that the State established the elements of the offense and negated the proposed defenses, the Defendant is not entitled to relief.

## II. Thirteenth Juror

We interpret the Defendant's next argument as an assertion that the trial court's findings at the sentencing hearing were inconsistent with approving the verdict of guilty as thirteenth juror and that the Defendant is therefore entitled to a new trial.

Under Tennessee Rule of Criminal Procedure 33, "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d). The trial court's determination regarding whether to grant a new trial as thirteenth juror is a distinct inquiry from determining whether the evidence is legally insufficient to sustain a verdict. *State v. Ellis*, 453 S.W.3d 889, 898 (Tenn. 2015). A finding that the evidence is legally insufficient – that no rational trier of fact could have returned a conviction – results in an acquittal. *Id.* However, the trial court may instead find as thirteenth juror that it disagrees with the jury's resolution of conflicting evidence and that a defendant should receive a new trial in which a different jury has the opportunity to assess the State's case. *Id.* The trial court's assessment of the evidence as thirteenth juror does not require it to view the evidence in the light most favorable to the State but instead permits a determination that "'the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'" *Id.* at 899 (quoting *State v. Johnson*, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting) *superseded by rule as stated in Ellis*, 453 S.W.3d at 900, n.6).

The trial judge acting as thirteenth juror must assess whether the evidence has established guilt beyond a reasonable doubt. *State v. Moats*, 906 S.W.2d 431, 433 (Tenn. 1995). The accuracy of a determination as thirteenth juror is not subject to appellate review. *Id.* at 435. The trial court need not make an explicit finding that it approves the verdict, and an appellate court presumes from the denial of a new trial that the judge approved the verdict. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). "[W]here the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, an appellate court may reverse the trial court's judgment." *Id.* If an appellate court determines that the trial court misconstrued its role as thirteenth juror or failed to grant a new trial despite its determination that the verdict was against the weight of the evidence, the remedy is a new trial. *Moats*, 906 S.W.2d at 435 (granting new trial when trial judge stated on the record that the weight of the evidence did not support the verdict but failed to grant a new trial because the evidence was legally sufficient).

The Defendant's claims are based on the argument that the trial court expressed disagreement with the verdict but failed to grant a new trial. At sentencing, the trial

judge stated, "I believe the defendant honestly believed he was in danger and at risk when he pulled the weapon. That does not justify it[,] but I think it does create a factor for the Court to consider…." In denying diversion, the judge reiterated, "Do I believe you thought you were provoked, do I believe you thought your conduct was reasonable and justified? I think you thought that. That does not make it reasonable or justified, but I honestly believe you felt you and your family were at risk." In denying the motion for a new trial, the court found "that the Defendant was genuine in his belief that his actions were necessary to protect against [the victim's] use of force." The trial court, however, went on to find "that [the Defendant's] pulling a gun under the circumstances was not reasonable and therefore [the court] declines…to overturn the Jury's verdict."

Accordingly, the trial court's statements at sentencing were simply a finding that the Defendant held an honest belief that his use of force was necessary to protect himself or his family but that the Defendant's belief was not a reasonable one, as required by the statutory provision regulating self-defense. The trial court approved the jury's verdict that the State had proven beyond a reasonable doubt that the Defendant was not acting in self-defense or defense of others. We conclude that the trial court properly performed its role as thirteenth juror and approved the jury's verdict. Accordingly, the Defendant is not entitled to relief.

### III. Juror's Comment

The Defendant asserts that his due process right to an impartial jury was violated when the trial court permitted a juror to ask questions. The State responds that this issue is waived for failure to object during trial, and the Defendant responds that counsel could not object to the juror's statement without a risk of alienating the jury.

After the defense had finished cross-examining Deputy King, repeatedly asking him if he found the actions of the victim's family "odd," one of the jurors asked how much longer the trial would take, noting that counsel kept "asking the same thing over and over." The trial court informed the juror that it would be "a reasonable amount of time," and the jury was permitted to take a break. The defense did not ask for the juror to be dismissed and did not request a mistrial.[4]

We agree with the State that the issue is waived because the Defendant did not raise the issue during trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be

---

[4] The State also argues that any claim that the juror should have been dismissed is waived for failure to raise it in the motion for a new trial, which asserted that the trial court erred in "permitting a juror to interrupt" the proceedings, denying him due process. The motion for a new trial adequately raises the issue that the Defendant was denied his right to an impartial jury.

construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Although the Defendant argues that raising the issue contemporaneously would have alienated the jury, the jury left the courtroom immediately after the comment, and the Defendant had ample time to seek a remedy for any alleged error, including dismissal of the juror or mistrial. In fact, the trial court specifically asked if the parties had any motions to put before the court, and the defense then moved for acquittal. Accordingly, the issue is waived for failure to raise it at trial.

Insofar as the Defendant seeks plain error review, the following factors must be present: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Here, no clear and unequivocal rule of law was breached, no substantial right of the accused was adversely affected, and consideration of any error is not necessary for substantial justice.

The accused has the right to a trial by an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013). A claim that the Defendant's right to an impartial jury was compromised can be based on an allegation that the jury was exposed to extraneous prejudicial information or that a juror harbored personal bias. *State v. William Darelle Smith*, No. M2014-00059-CCA-R3-CD, 2015 WL 100452, at *4 (Tenn. Crim. App. Jan. 7, 2015), *perm. app. denied* (Tenn. May 14, 2015). A trial court should discharge a juror who becomes disqualified. *Smith*, 418 S.W.3d at 45.

In a claim that the jury has been tainted by extraneous prejudicial information, disqualification, mistrial, or a new trial should only be granted when there is extra-judicial communication which is prejudicial to the defendant and not harmless error. *Id.* at 49. "A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013); *Smith*, 418 S.W.3d at 48 (noting that a witness's note to the trial court regarding a communication with a juror was admissible because it "related to potentially prejudicial external influences" and not "the jury's deliberations or the juror's thought processes"). The admissibility of this type of evidence is governed by Tennessee Rule of Evidence 606(b), which states:

- 15 -

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion….

Intra-jury pressure or intimidation are "internal matters that do not involve extraneous information or outside influence." *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990). Likewise, "a juror's subjective thoughts, fears, and emotions" are internal influences "that are not grounds to overturn a verdict." *Id.*

We conclude that there is no basis to overturn the verdict because the Defendant cannot make a showing that the jury was exposed to extraneous prejudicial information or provide admissible evidence regarding the validity of the verdict. *See Adams*, 405 S.W.3d at 651. In *Carruthers v. State*, the defendant, who had an extensive history of harassing and intimidating witnesses and his attorneys, was convicted by an anonymous jury. 145 S.W.3d 85, 90 (Tenn. Crim. App. 2003). On post-conviction, the defendant sought to discover the identity of the jurors, based in part on the fact that two jurors sent a note to the judge asking why the defendant, who had forfeited his right to counsel, "'was constantly asking the same question over and over.'" *Id.* at 92. This court concluded that there was no basis for revealing the jurors' identities because, as the juror complaints "did not come from a source outside the jury," they would not be admissible in an inquiry into the validity of a verdict under Tennessee Rule of Evidence 606(b). *Id.* In *State v. Caughron*, a juror commented on counsel's questioning of a witness and was dismissed, and the defendant claimed that the trial court should have declared a mistrial with the remaining jurors. 855 S.W.2d 526, 540 (Tenn. 1993). The Tennessee Supreme Court denied relief, noting that the removed juror's remark "was a comment upon counsel's repetitive questioning [and] not upon the merits of the case." *Id.* Here, the juror's statement that defense counsel was asking redundant questions was an expression of his "subjective thoughts, fears, and emotions," which are internal influences and cannot serve as the basis for overturning the verdict. *Caldararo*, 794 S.W.2d at 742.

Neither has there been any showing of bias from the juror. Bias is "'a leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; [a] bent; [or] inclination.'" *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting *Durham v. State*, 188 S.W.2d 555, 559 (Tenn. 1945)). It is

the defendant's burden to establish a *prima facie* case of juror bias. *State v. Robinson*, 146 S.W.3d 469, 523 (Tenn. 2004). The Defendant has made no showing that the juror's impatience with allegedly repetitive questioning indicated any sort of bias against the Defendant. The Defendant is not guaranteed jurors who form no opinions based on the actions of defense counsel, but only jurors who are impartial and who base their verdict on the evidence presented at trial. Accordingly, the Defendant cannot establish plain error. *See Bishop*, 431 S.W.3d at 44.

## IV. Evidence Presented at Sentencing

The Defendant also argues that the trial court erred in allowing the State to present testimony regarding a prior acquittal on a charge of aggravated assault committed with the same weapon. The Defendant contends that it was error to consider the charge in denying diversion.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Tennessee Code Annotated section 40-35-313 provides that the trial court may "defer further proceedings" against a qualified defendant by imposing, with the defendant's consent, reasonable probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A) (Supp. 2012). If the probationary period is successfully completed, the court will dismiss the charges without an adjudication of guilt, and the proceedings may be expunged. *Id*. § 40-35-313(a)(2), (b) (Supp. 2012). In making the determination regarding whether to grant diversion, the trial court must consider: (a) the amenability of the defendant to correction, (b) the circumstances of the offense, (c) the defendant's criminal record, (d) the defendant's social history, (e) the defendant's physical and mental health, (f) the deterrence value to the defendant as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the defendant. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The trial court must weigh the factors and provide an explanation of its ruling. *Id.* The decision to grant judicial diversion, which is ultimately a "legislative largess," rests within the sound discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). This court must review a decision regarding diversion for abuse of discretion accompanied by a presumption of reasonableness, and it must determine if any substantial evidence supports the trial court's decision. *Id.* at 326. "[E]ven though an abuse of discretion standard of review is appropriate for a trial court's

judicial diversion decision, the trial court must consider and discuss each of the *Parker* and *Electroplating* factors on the record before the appellate court can determine whether 'any substantial evidence' exists to support the decision." *Id.* at 327. The decision regarding diversion will be upheld on appeal so long as "the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, … places on the record its reasons for granting or denying judicial diversion," and there is substantial evidence in support of the decision. *Id.* Not every factor must be recited as long as the record reflects that the factors were considered. *Id.*

The State cites to *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000), for the proposition that the facts underlying a prior acquittal may properly be presented in sentencing.[5] The rationale for this is that an acquittal signifies that the evidence was insufficient to establish the elements of the offense beyond a reasonable doubt, but facts relevant to sentencing may be established by a preponderance of the evidence. *Id.* While it is true that mere arrest is not "criminal behavior" relevant to sentencing and therefore cannot be considered by the sentencing court, *State v. Newsome*, 798 S.W.2d 542, 543 (Tenn. Crim. App. 1990), prior criminal behavior which was the basis of an arrest may be considered if it is established by a preponderance of the evidence, *State v. Carico*, 968 S.W.2d 280, 287 (Tenn. 1998). The court in *Winfield* ultimately concluded that "[t]he Act does not preclude consideration of facts proven by a preponderance of the evidence, even where the facts are the basis of a charge for which there has been an acquittal." *Winfield*, 23 S.W.3d at 283.

Here, when the defense objected to the testimony regarding the prior charge, the prosecutor noted that she wished to establish previous conduct that was criminal in nature, and the trial court permitted the State to proceed. However, the testimony presented by Deputy King did not establish any criminal behavior by a preponderance of the evidence. Instead, Deputy King's testimony was limited to the fact that the weapon previously came to the attention of law enforcement when the Defendant was charged with, and ultimately acquitted of, aggravated assault. While Deputy King could have presented testimony regarding the facts underlying that charge, he did not do so, and the mere fact that the Defendant was arrested, tried, and acquitted of another offense does not establish any prior criminal behavior by a preponderance of the evidence. Accordingly, the testimony that the Defendant was previously arrested and acquitted of an offense was not relevant to sentencing.

---

[5] While judicial diversion is not itself a sentence, the decision to grant or deny diversion is a "sentencing decision." *King*, 432 S.W.3d at 324-25 (holding that decisions regarding diversion are reviewed under standard of review applicable to sentencing). Accordingly, we conclude that the cases cited here regarding the admissibility of prior criminal behavior in sentencing are applicable to sentencing decisions regarding diversion. *See State v. Dycus*, 456 S.W.3d 918, 932 (Tenn. 2015) (considering defendant's criminal behavior during review of decision regarding diversion).

However, the record establishes that the trial court did not rely on this testimony in making its sentencing decision. *See, e.g., State v. Bottoms*, 87 S.W.3d 95, 102 (Tenn. Crim. App. 2001) (trial court made no specific references to dismissed charges); *Newsome*, 798 S.W.2d at 543 ("We agree with the appellant that the trial judge should not use mere arrest[s] in determining what sentence to impose. In this case, it is clear the trial judge did not do so."). The trial court, in denying the motion for a new trial, orally noted that its decision was based on "the facts in the underlying case." In its written order, the trial court found that its decision regarding diversion was based on the its evaluation of the circumstances underlying the offense and its concern regarding recidivism. The Defendant's amenability to correction, the circumstances of the offense, the deterrence value of the sentence to the Defendant, and the interests of the public were all proper factors to consider in determining whether to grant diversion. *Electroplating,* 990 S.W.2d at 229. It appears that the trial court did not consider the testimony regarding the arrest in making the decision denying diversion, and the Defendant does not argue that the trial court failed to consider the appropriate factors. The trial court summarized that its denial of diversion was based on the circumstances of the offense and on a concern that the Defendant would again threaten someone with a firearm if he were granted diversion. The record contains substantial evidence supporting a denial of diversion, and the trial court did not abuse its discretion.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE