IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 17, 2025 Session

## STACIE SMITH v. GARY MEEK

**Appeal from the Circuit Court for Knox County
No. C-23-117223    William T. Ailor, Judge**

### No. E2024-00647-COA-R3-CV

This appeal arises out of a landlord-tenant dispute between Appellant Stacie Smith and Appellee Gary Meek. In response to a plumbing issue in her rented home, Ms. Smith sought injunctive relief from the Knox County General Sessions Court requiring Mr. Meek to make certain repairs to the home. The General Sessions Court granted the requested injunction, which Mr. Meek appealed to the Knox County Circuit Court. Following a bench trial, the Circuit Court entered judgment in favor of Mr. Meek and dismissed Ms. Smith's complaint. Finding no reversible error, we affirm the judgment of the Circuit Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

G. Michael Davis, Knoxville, Tennessee, for the appellant, Stacie Smith.

Craig L. Garrett, Maryville, Tennessee, for the appellee, Gary Meek.

## OPINION

### BACKGROUND

Beginning in January 2023, Ms. Smith leased a one-bedroom, one-bathroom home from Mr. Meek for herself and her eleven-year-old son. Ms. Smith avers that on May 9 or 10,[1] 2023, she called Mr. Meek's business office and reported to one of Mr. Meek's

---

[1] In Ms. Smith's first Verified Complaint filed with the Knox County General Sessions Court, she avers that the plumbing issue began on May 9 and that she initially notified Mr. Meek of the issue on May

employees a major plumbing issue—raw sewage backing up into the home's basement, bathtub, washing machine, and toilet. Mr. Meek denies receiving this message. It is undisputed that Mr. Meek did not reply to Ms. Smith's message or take any steps to correct the issue until May 19, 2023, when Ms. Smith texted Mr. Meek a photo of a written document detailing the plumbing issue and asking him to contact her immediately or she would "take action with [her] lawyer." On May 19 or 20, Mr. Meek sent Buckley Kidd ("Mr. Kidd") to assess the situation. Mr. Kidd later testified that he does "home renovations" and is a licensed contractor. He is also a tenant of Mr. Meek. Mr. Kidd reported to Mr. Meek that he would not be able to resolve the issue himself and that Mr. Meek would need to hire a plumber. On May 20, Mr. Meek hired Richard Watts, a licensed plumber who is also a tenant of Mr. Meek, to address the issue. Mr. Watts installed a cleanout plug, which temporarily corrected the issue. The following day, May 21, Ms. Smith alerted Mr. Meek that the system was backed up again and asked for a motel voucher, noting that while the issue was ongoing, she and her son could not shower or use the toilet. Thereafter, at Mr. Meek's direction, Mr. Kidd unsuccessfully attempted to snake the pipe himself and then contacted a local plumbing company, The Plumbing Authority, to address the issue.

On or about May 23, 2023, the issue remained ongoing, and Ms. Smith filed a Verified Complaint (the "First Complaint") against Mr. Meek in the General Sessions Court seeking a temporary injunction "ordering [Mr. Meek] to restore essential services to [the] home immediately;" in the event "essential services [could] not be restored promptly," Ms. Smith asked the Knox County General Sessions Court to order Mr. Meek to pay for "reasonable alternative temporary housing [for Ms. Smith] until such time as essential services [could] be restored, and the property [was] back in [a] fit and habitable condition[.]" Ms. Smith also requested that Mr. Meek be ordered to pay restitution for her costs of repair, diminution of value of the rental property, alternative housing costs, and her attorney's fees. On May 24, 2023, the General Sessions Court entered a written ruling stating:

> First, the Court affirms [Ms. Smith's] position that her current living condition with significant sewage back-up and leaks is presently deplorable, inhabitable, and dangerous to the occupants of [the home].
>
> [Ms. Smith] first provided written notice via text of her living conditions to [Mr. Meek] on May 19, 2023[] per [Ms. Smith's] own request for injunctive relief. Tenn. Code Ann. 66-28-501 requires 14 days written notice to the [l]andlord for the [p]laintiff to terminate the lease. [Ms. Smith] is not

---

10. However, during trial Ms. Smith adamantly testified that she notified Mr. Meek of the issue as soon as she discovered it on May 9.

requesting lease termination. Injunctive relief may be available under this code section.

[Ms. Smith] requests injunctive relief by application of Tenn. Code Ann. 66-28-502. Injunctive relief is not applicable to this statute. The statute sets out the [t]enant[']s options in this scenario, where the [t]enant does not elect lease termination.

Per Tenn. Code Ann. 66-28-502, the court does not have the authority to order [Mr. Meek] to pay for substitute housing until the sewage problem is abated, however, [Ms. Smith] has the right to procure the substitute housing, cease paying rent during the period the sewage issue [persists], and then may even recover the cost of that substitute housing and attorneys fees if [Mr. Meek] does not willing[ly] reimburse [Ms. Smith] those costs, once paid.

In this case, where [Ms. Smith] is indigent and suffering through this disgusting and dangerous hardship, the Court suggests [Mr. Meek] consider the possibility of much larger future liability if [he] does not assist [Ms. Smith by] providing alternate housing now. However, the Court cannot [o]rder the remedy by [i]njunction or otherwise at this point and the statute spells out [Ms. Smith's] options.

Also on May 24, Mr. Meek provided Ms. Smith with a check in the amount of $240.00 for rent abatement. Ms. Smith later testified that she used the funds from Mr. Meek to pay for three nights of motel stays.

Mr. Meek and Mr. Kidd continued contacting The Plumbing Authority for assistance but received no response from them. Finally, Mr. Meek hired a different plumbing company, Roto-Rooter, to resolve the issue. On May 31, Roto-Rooter snaked and ran a camera through the home's main sewer line, removing a rag from the pipe and noting roots in the pipe. Once again, this temporarily resolved the issue; however, Ms. Smith texted Mr. Meek on June 4 to let him know that the issue had recurred. Roto-Rooter returned to the home on June 5 and used a high-powered water jet to clean the pipe. Roto-Rooter's report from this visit states: "Ran the [c]amera and [f]ound a spot where the [c]ast [i]ron pipe meets the [c]oncret[e] pipe[.] Looks to be broken [d]own. Has some mud and [r]oots in that area. Recom[m]end [r]epair[]." There were no further issues with the plumbing backing up between the second Roto-Rooter visit on June 5 and when Ms. Smith ultimately vacated the premises in early to mid-July 2023. Mr. Kidd testified that he dug up and replaced the main sewer line pipe in late June 2023 and that the pipe was not collapsed but did have a small hairline fracture.

Also on June 5, 2023, Ms. Smith's counsel emailed Mr. Meek's counsel to notify him of other complaints that Ms. Smith had about the condition of the home, namely that the "windows are painted shut or covered with plastic," "[t]he air conditioning and heat have been out for months[,]" and "the plumber told her there is still feces in the basement [which] needs to be immediately cleaned out." Ms. Smith's counsel stated that Ms. Smith would be asking for an injunction the following day if these items were not remedied.

On Monday, June 12, 2023, Ms. Smith filed a second Verified Complaint (the "Second Complaint") for emergency relief in the General Sessions Court under the same docket number as the First Complaint. In the Second Complaint, Ms. Smith conceded that "the plumbing is currently functioning" but averred that Mr. Meek "had not yet made permanent repairs to the drain pipe, and it is likely to fail again." She also averred that the issues regarding the windows, heat and air-conditioning unit, and sewage waste in the basement were ongoing. However, it is undisputed that during the weekend immediately preceding June 12, Mr. Kidd had gone to the home, at Mr. Meek's instruction, made sure all the windows could be opened, and installed two window air-conditioning units (resulting in a total of three window units in the home). Mr. Kidd also later testified that he had already addressed the waste in the basement and was told by Ms. Smith's boyfriend that it looked good. Despite this, the General Sessions Court issued an injunction (the "Injunction") that same day pursuant to Tennessee Code Annotated section 66-28-501[2] ordering that:

A. [Ms. Smith] is excused from paying rent for the entire month of May, 2023;

B. Grant of an Injunction against [Mr. Meek], ordering him to immediately:

    a. Repair the plumbing;
    b. Repair all windows to normal, secure, operation; and
    c. Repair the central air conditioning, or provide temporary air conditioning units.

C. [Ms. Smith] is excused from paying rent for June, 2023, except pro rata from the date when all the above repairs are completed to reasonable satisfaction;

D. [Mr. Meek] is restrained from issuing any detainer warrant based on non-payment of rent for any excused rent from May and June of 2023;

---

[2] Except as otherwise provided by the Tennessee Uniform Residential Landlord and Tenant Act, a "tenant may recover damages, obtain injunctive relief and recover reasonable attorney's fees for any noncompliance by [a] landlord with [a] rental agreement or any section of [the Act] upon giving fourteen (14) days' written notice." Tenn. Code Ann. § 66-28-501(a).

E. Until the above repairs are completed to reasonable satisfaction, [Mr. Meek], at his costs equal to $150 per day, shall provide reasonable alternative temporary housing to [Ms. Smith] until such time as the repairs are completed, and the property is back in fit and habitable condition without material health and safety risks to [Ms. Smith];

F. ~~Order [Mr. Meek] to pay all reasonable attorney's fees of $7,660 associated with this and the first Complaint for Injunction to [Ms. Smith] (*See* Attorney's Affidavit);~~[3]

G. Tax all court costs of this matter to [Mr. Meek]; and

H. Order any further relief for [Ms. Smith] that this Court deems appropriate.

Mr. Meek appealed the Injunction to the Knox County Circuit Court on June 15, 2023.

After multiple continuances, the Circuit Court scheduled the matter for a bench trial to be held on February 16, 2024. On January 10, 2024, thirty-seven days before the trial date, Ms. Smith filed a motion for partial summary judgment. On January 31, Ms. Smith's counsel notified Mr. Meek's counsel by email that the Circuit Court would not hear the motion for partial summary judgment and would instead just proceed with the trial. In another email the following day, Ms. Smith's counsel further explained: "[The Circuit Court judge's] assistant called me last week to say the [Circuit] Court would not set the [m]otion for hearing nor continue the trial. Apparently they have an unwritten policy of not setting [motions for summary judgment] until about 45 days after filing." At the beginning of the bench trial on February 16, the following exchange took place:

[MS. SMITH'S COUNSEL]: And, actually, just a few preliminary issues.

Just for clarification, regarding the motion for partial summary judgment Ms. Smith filed on January 10th, which has not been answered, the Court is still declining to hear that motion before trial today; is that correct?

THE COURT: Absolutely. Your motion was filed too late for [Mr. Meek] to file a response when this matter was already set for trial and the Court's order said clearly that the case would not be reset. And based on the fact that -- since it was filed January 10th, the date to -- after which to file an answer would have been February the 12th. This is February the 16th, which

---

[3] It appears that this paragraph was struck through by the General Sessions Court judge, who initialed and dated such revision. These revisions are handwritten.

would not have given [Mr. Meek] an opportunity to properly file a response and the Court to review the response.

So the Court is not going to hear the motion for summary judgment.
[MS. SMITH'S COUNSEL]: Okay. Thank you, Your Honor.

Ms. Smith, Mr. Meek, and Mr. Kidd testified at trial. The Circuit Court found Mr. Meek and Mr. Kidd to be credible witnesses and Ms. Smith to be a sympathetic but ultimately uncredible witness. On April 3, 2024, the Circuit Court entered an order dismissing Ms. Smith's complaint and incorporating its Memorandum Opinion that had been announced in open court on March 18, 2024. In its Memorandum Opinion, the Circuit Court found:

From everything that the Court has heard and the Court's review of the exhibits that have been entered in the record and based on the Court's determination of the credibility of the witnesses, the Court is of the opinion that [Ms. Smith] has failed to prove that [Mr. Meek] violated the Tennessee Residential Landlord and Tenant Act and, further, that [Mr. Meek] did everything that he could and what a reasonable person would do to alleviate the issues, and that [Ms. Smith's] actions and/or the actions of those living in the household aggravated the living conditions.

Pursuant to Tennessee 66-28-304 Subsection (a) and Subsection (2)[4] .... [Ms. Smith] has failed to comply with TCA 66-28-401[5] and 66-28-506.

---

[4] "The landlord shall . . . [m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition[.]" Tenn. Code Ann. § 66-28-304(a)(2).

[5] Section 66-28-401 requires a tenant to:

(1) Comply with all obligations primarily imposed upon tenants by applicable provisions of building and housing codes materially affecting health and safety;

(2) Keep that part of the premises that the tenant occupies and uses as clean and safe as the condition of the premises when the tenant took possession;

(3) Dispose from the tenant's dwelling unit all ashes, rubbish, garbage, and other waste to the designated collection areas and into receptacles;

(4) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or permit any person to do so; and shall not engage in any illegal conduct on the premises; and

[Ms. Smith] and [Mr. Meek] were both obligated to act in good faith as a condition preced[ent] to an order to exercise a right or remedy to act pursuant to 66-28-516.[6]

The Court finds that [Mr. Meek] attempted to do everything and [Ms. Smith] failed to do so, therefore the Court dismisses [Ms. Smith's] complaint and taxes the costs to [Ms. Smith] or her surety, for which execution shall issue if necessary.

Ms. Smith appeals the Circuit Court's final judgment.

## ISSUES

Ms. Smith raises five issues on appeal, which we restate slightly:

1. Whether the Circuit Court erred by not hearing Ms. Smith's motion for partial summary judgment and by not deeming admitted Ms. Smith's Statement of Undisputed Material Facts?

2. Whether the Circuit Court abused its discretion in finding that Mr. Meek was not negligent in maintaining and repairing the home?

3. Whether the Circuit Court abused its discretion in finding Mr. Meek's testimony credible and Ms. Smith's testimony not credible?

4. Whether the Circuit Court abused its discretion in finding Ms. Smith's own actions aggravated the living conditions of the house and that Ms. Smith was more at fault than Mr. Meek?

5. Whether the Circuit Court erred in not awarding punitive damages to Ms. Smith?

---

(5) Act and require other persons on the premises, with the tenant's or other occupants' consent, to act in a manner that will not disturb the neighbors' peaceful enjoyment of the premises.

Section 66-28-506, in turn, provides a landlord's rights to enter a dwelling unit and make repairs if a tenant fails to comply with the requirements of section 66-28-401.

[6] "Every duty under [the Tennessee Uniform Residential Landlord and Tenant Act] and every act which must be performed as a condition precedent to the exercise of a right or remedy under [the Act] imposes an obligation of good faith in its performance or enforcement." Tenn. Code Ann. § 66-28-516.

Mr. Meek asks us to find that Ms. Smith's appeal is frivolous and to award him his attorney's fees and expenses pursuant to Tennessee Code Annotated section 27-1-122.

## DISCUSSION

*a.*

After the parties filed their appellate briefs, Ms. Smith filed a motion asking this Court to "dismiss this matter in favor of [Ms. Smith], vacate the Circuit Court's April 3, 2024, and September 19, 2024, Final Judgments,[7] and remand this matter to the Knox County General Sessions Court for further proceedings." The basis for Ms. Smith's motion is that the Injunction entered by the General Sessions Court was not a final order; thus, the Circuit Court did not have subject matter jurisdiction over Mr. Meek's appeal of the Injunction.

While Ms. Smith frames this as a motion to dismiss, we construe it as an additional argument in support of her position that the Circuit Court's judgment should be vacated, an argument Ms. Smith failed to include in her appellate briefs. Likewise, she did not raise this issue before the Circuit Court. Normally, this argument would be waived for these reasons. *See, e.g., Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived."); *see also* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."). However, arguments based upon a lack of subject matter jurisdiction may be raised at any time and cannot be waived. *See* Tenn. R. App. P. 13(b) ("The appellate court *shall* also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review[.]" (emphasis added)).

Under Tennessee law, an appeal from general sessions court to circuit court may generally only be taken when the general sessions court has entered a final judgment, as opposed to an interlocutory order. *Graham v. Walldorf Prop. Mgmt.*, No. E2008-00837-COA-R3-CV, 2009 WL 723837, at *5 (Tenn. Ct. App. Mar. 19, 2009); Tenn. Code Ann. § 27-5-108; *see Nandigam Neurology, PLC v. Beavers*, 639 S.W.3d 651, 661 (Tenn. Ct. App. 2021) (exceptions to the final judgment requirement may be created by rule or statute). Ms. Smith argues that the Injunction was an interlocutory order because her Second Complaint requested a *temporary* injunction, and the General Sessions Court granted the requested *temporary* injunctive relief and reset the case to June 27, 2023. This is not supported by the record on appeal. A review of Ms. Smith's First Complaint reveals

---

[7] While this matter was pending in the Circuit Court, Ms. Smith amended and supplemented her Second Complaint to include a claim for damages. Thereafter, Mr. Meek filed an Answer and Counter-Complaint, which was not addressed by the order entered by the Circuit Court on April 3, 2024. Upon agreement of the parties, the Circuit Court entered a supplement to the final judgment on September 19, 2024, which dismissed Mr. Meek's Counter-Complaint.

that it does, in fact, request a temporary injunction. Notably, however, her Second Complaint simply requests an injunction, with no request that such injunction be temporary. "An 'amended complaint' supersedes the original complaint, rendering it of no legal effect." *Stephens v. Home Depot U.S.A., Inc.*, 529 S.W.3d 63, 70 (Tenn. Ct. App. 2016) (citing *Christian v. Lapidus*, 833 S.W.2d 71, 73 n.2 (Tenn. 1992)). A pleading is an amended complaint when it is "complete in itself without adoption or reference to the original," whereas an amendment to a complaint "merely modifies the existing complaint[,] which remains before the court as modified." *Id.* (quoting *McBurney v. Aldrich*, 816 S.W.2d 30, 33 (Tenn. Ct. App. 1991)). Ms. Smith's Second Complaint was complete in itself; therefore, it was an amended complaint that superseded her First Complaint. As such, the operative complaint before the General Sessions Court did not request a temporary injunction but instead simply requested an injunction. Moreover, the Injunction entered by the General Sessions Court does not indicate in any way that it is temporary.

Likewise, we have found nothing in the record to support Ms. Smith's claim that the General Sessions Court reset its case, bearing General Sessions Court docket number 59672K, for a later hearing. Instead, the record reflects that the General Sessions Court set a separate action filed in that court by Mr. Meek against Ms. Smith, bearing General Sessions Court docket number 59655K, for hearing on June 27, 2023. As indicated by its separate docket number, Mr. Meek's action filed against Ms. Smith was a wholly separate action and does not have any impact on the finality of the Injunction entered in this case, docket number 59672K.

A final judgment adjudicates all "claims, rights, and liabilities of all the parties" and "resolves all the issues [leaving] 'nothing else for the trial court to do.'" *E Sols. for Bldgs., LLC v. Knestrick Contractor, Inc.*, No. M2017-00732-COA-R3-CV, 2018 WL 1831116, at *2 (Tenn. Ct. App. Apr. 17, 2018) (citing *Discover Bank v. Morgan*, 363 S.W.3d 479, 488 n.17 (Tenn. 2012); *In re Est. of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003)). The Injunction granted Ms. Smith every item of relief she requested in her Second Complaint, except for her attorney's fees,[8] and taxed court costs to Mr. Meek. There is nothing on the face of the Injunction or elsewhere in the record before us to indicate that the Injunction was anything but a final judgment. Therefore, Ms. Smith's motion to dismiss is not well-taken and must be denied.

*b.*

Ms. Smith also filed a motion to strike portions of Mr. Meek's appellate brief due to his failure to comply with Tennessee Rule of Appellate Procedure 27(a)(7)(A) and

---

[8] The General Sessions Court clearly considered Ms. Smith's request for attorney's fees and ultimately denied that request as indicated by the judge's handwritten notations on the Injunction.

Tennessee Court of Appeals Rule 6(b), which require that the argument section of briefs filed in this Court include record citations. As our Supreme Court has recently emphasized:

> Appellate litigants have an obligation to file briefs that comply with all applicable rules, including the rules requiring record citations in both the statement of facts and argument sections of the brief. *See* Tenn. R. App. P. 27(a)(6), (7); Tenn. Ct. App. R. 6(a)(4), (b). But [the High] Court has repeatedly emphasized that the overall intent of the appellate rules is "to disregard technicality in form in order to determine every appellate proceeding on its merits." *Trezevant v. Trezevant*, 696 S.W.3d 527, 530 (Tenn. 2024). "A court's construction and application of the rules should further that intent and should enhance, not impede, the search for justice." *Johnson v. Hardin*, 926 S.W.2d 236, 238–39 (Tenn. 1996). Given "the importance of applying the Rules of Appellate Procedure to reach a just result," *Trezevant*, 696 S.W.3d at 531, Tennessee courts must reasonably exercise their discretion to excuse technical deficiencies that do not significantly impede the appellate process, *see* Tenn. R. App. P. 2 (giving appellate court discretion to suspend rules); Tenn. Ct. App. R. 1(b) (same for Court of Appeals rules).

*DiNovo v. Binkley*, 706 S.W.3d 334, 336 (Tenn. 2025) (citing Tenn. R. App. P. 27(a)(6), (7); Tenn. Ct. App. R. 6(a)(4), (b)).

We agree with Ms. Smith's observation that the argument section of Mr. Meek's appellate brief fails to comply with Rule 27(a)(7)(A) and Rule 6(b). However, as was the case in *DiNovo*, Mr. Meek's brief contains appropriate record citations in the statement of the case and statement of facts sections. Although Mr. Meek did not repeat those citations in the argument section of his brief, that deficiency does not impede this Court's ability to understand and locate the factual bases for Mr. Meek's arguments in this case. Thus, we reasonably exercise our discretion to excuse this technical deficiency that does not significantly impede the appellate process, *see DiNovo*, 706 S.W.3d at 336, and we deny Ms. Smith's motion to strike.

c.

Turning to the issues stated in her appellate brief, Ms. Smith argues that the Circuit Court erred by declining to hear her motion for summary judgment because it was filed thirty-seven days before the trial date. Ms. Smith urges that her motion was timely filed pursuant to Tennessee Rule of Civil Procedure Rule 56.04 and should have been heard.

Rule 56.04 requires that motions for summary judgment "be served at least thirty (30) days before the time fixed for the hearing." This filing deadline "'is intended to enable

lawyers to be fully prepared to present their arguments at the hearing on the summary judgment motion,' but it 'also exists to enable the trial court to control its docket and to give the court sufficient opportunity to review the case file to be likewise fully prepared to rule on the motion.'" *Brecker v. Story*, No. M2023-01640-COA-R3-CV, 2025 WL 304571, at *7 (Tenn. Ct. App. Jan. 27, 2025), *no perm. app. filed*, (quoting *Kenyon v. Handal*, 122 S.W.3d 743, 755 (Tenn. Ct. App. 2003)). Moreover,

> [g]ood trial judges set and enforce deadlines and also have the right to assume that the deadlines they set, as well as those imposed by the rules, will be honored. Because trial courts enjoy substantial discretion to control the disposition of cases on their dockets, we customarily defer to their decisions regarding continuances, enlargements of time, or other relief from deadlines. Accordingly, we will let the trial court's decision on these matters stand in the absence of clear prejudicial error under the circumstances of the case.

*Kenyon*, 122 S.W.3d at 751 (internal citations omitted).

On December 6, 2023, the Circuit Court entered an order of continuance that set the matter for trial on February 16, 2024, and stated: "This matter will <u>NOT</u> be continued again." Ms. Smith filed her motion for summary judgment on January 10, 2024. At the beginning of the trial on February 16, the Circuit Court explained that it would not hear Ms. Smith's motion for summary judgment because the late filing "would not have given [Mr. Meek] an opportunity to properly file a response and the Court to review the response." Again, "trial courts enjoy substantial discretion to control the disposition of cases on their dockets," *Kenyon*, 122 S.W.3d at 751, and we do not find that the Circuit Court abused its discretion in declining to hear Ms. Smith's motion.

Ms. Smith also argues that she "should have at least been entitled to the [Circuit Court] deeming her undisputed facts as admitted" because Mr. Meek failed to file any response to her motion and accompanying Rule 56.03 statement of material facts. However, Ms. Smith does not cite to any place in the record where she made such request of the Circuit Court, nor did we find any such request in the record before us. Because Ms. Smith did not raise this issue before the Circuit Court and instead raises it for the first time on appeal, this issue is waived. *Black*, 938 S.W.2d at 403.

*d.*

Ms. Smith's next three raised issues argue that the Circuit Court abused its discretion in making certain factual findings. However, abuse of discretion is not the standard of review applicable to these issues. Because this case was tried by the Circuit Court sitting without a jury, we review the Circuit Court's factual findings de novo with a presumption of correctness, unless the preponderance of the evidence is otherwise. *Cross*

*v. City of Memphis*, 20 S.W.3d 642, 644 (Tenn. 2000); *see also* Tenn. R. App. P. 13(d). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). "When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony." *Hughes v. Metro. Gov't of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011) (citing *Est. of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)). "Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary." *Id.* (citing *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). We review the Circuit Court's conclusions of law de novo with no presumption of correctness. *Hargis v. Fuller*, No. M2003-02691-COA-R3-CV, 2005 WL 292346, at *3 (Tenn. Ct. App. Feb. 7, 2005) (citing *Briggs v. Est. of Briggs*, 950 S.W.2d 710, 712 (Tenn. Ct. App. 1997)).

i.

We address together Ms. Smith's second issue, whether the Circuit Court erred in finding that Mr. Meek was not negligent in maintaining and repairing the home, and her fourth issue, whether the Circuit Court erred in finding that Ms. Smith's own actions aggravated the living conditions of the house. Ms. Smith argues that the Circuit Court applied incorrect legal standards and made conclusions unsupported by facts in finding that Mr. Meek was reasonable and diligent in the way that he handled the plumbing issue. Specifically, she complains that the Circuit Court "did not apply this Court's standards from cases such as *Sneed* [*v. Henderson*, 366 S.W.2d 758 (Tenn. 1963)] and *Arzanzarrin* [*v. Johnstown Props., Inc.*, No. 01-A-01-9406-CV00259, 1994 WL 672675 (Tenn. Ct. App. Dec. 2, 1994)] . . . ." She also argues that the Circuit Court did not apply "this Court's correct legal standards in determining [] comparative fault as it ignored substantial evidence of the proximate cause and [Mr. Meek's] duty to respond and vet his contractors."

Ms. Smith relies on this Court's decision in *Allen v. Sulcer*, 255 S.W.3d 51 (Tenn. Ct. App. 2007) to argue that Mr. Meek should have "recognized that he needed a higher level of plumbing service provider." In *Allen*, the landlord had the tenant's father prune trees, despite the fact that the father had no experience. *Id.* at 53. The tenant was subsequently injured, and this Court explained:

> When a landlord undertakes to repair or maintain some part of the premises, he owes his tenants a duty to exercise ordinary and reasonable care in seeing the repairs are properly made. *Sneed v. Henderson*, 211 Tenn. at 585–86, 366 S.W.2d 758 (Tenn.1963); *Jolly Motor Livery Corp.* [*v. Allenberg*], 188

Tenn. 452, 221 S.W.2d 513, 515 (1949). Regarding this duty, the Tennessee Supreme Court has opined that

> [a] landlord is not an insurer of the safety of the leased premises. A landlord is liable only for injury arising from a failure to act with the degree of forethought and intelligence that characterizes the conduct of prudent men in general.
>
> * * *
>
> [In this case, the landlord] concedes he selected [the father] to act on his behalf (as an independent contractor) to perform this service for no compensation. He did this despite knowing [the father] did not like heights; did not want to perform this work; was a commercial truck driver, not a tree trimmer; and had no experience pruning large limbs from significant heights. . . .
>
> * * *
>
> . . . [The landlord] created an unreasonable risk of harm when he asked an unskilled tenant to conduct work that is dangerous. . . .
>
> We find that [the landlord] had a duty to select someone who would know how to minimize the risk of trimming such large branches. Engaging an unskilled and tentative tenant to trim a limb of this size and height at that particular location created a foreseeable probability of harm. . . .

*Id.* at 56–58 (footnote omitted).

*Allen* stands for the proposition that the landlord's duty to his tenant is one of ordinary care. *See Allen*, 255 S.W.3d at 56 ("In general, landlords owe a duty of reasonable care to their tenants."); *Sneed*, 366 S.W.2d at 764 (holding that a landlord owes his tenants "a duty to do that which a man exercising ordinary and reasonable care would [do] under like to similar circumstances" and "a duty not to omit the doing of any act which a man of ordinary care would not omit to do under the same standard"); *Arzanzarrin*, 1994 WL 672675, at *3 (holding that a landlord's duty owed under Tennessee Code Annotated section 66-28-304(a)(2) "is simply the duty of ordinary care, applicable to a wide variety of tort cases"). "Whether ordinary care was exercised under any given or proven state of facts must always be determined in relation to and in the light of the facts themselves, since what is ordinary care under one state of facts may be less than or more than ordinary care under another and different state of facts." *Smith v. Roane-Anderson Co.*, 207 S.W.2d 353, 355 (Tenn. Ct. App. 1947) (quoting *Nashville, C. & St. L. Ry. v. Wade*, 153 S.W. 1120,

1121 (Tenn. 1913)). The ordinary care standard "presupposes a margin of error" and does not require perfection. *Bradley v. Bishop*, 538 S.W.3d 518, 532 (Tenn. Ct. App. 2017) (quoting *Coleman v. Byrnes*, 242 S.W.2d 85, 89 (Tenn. Ct. App. 1950)).

Here, the record supports the Circuit Court's finding that Mr. Meek acted reasonably and engaged sufficiently qualified individuals to fix the plumbing issue. Ms. Smith testified that on May 9 or 10, she called and spoke to an employee of Mr. Meek to whom she reported the plumbing issue; however, Mr. Meek testified that he never received that message. It is undisputed that after Ms. Smith texted Mr. Meek written notice of the issue on May 19, Mr. Meek immediately contacted Mr. Kidd, a licensed contractor, to attempt to fix the issue.[9] When Mr. Kidd could not fix the issue, Mr. Meek sent Mr. Watts, who worked for a plumbing company, to address the issue. Mr. Watts repaired the system such that it worked correctly for a couple of days. The Circuit Court found that when the issue re-occurred on May 21, Mr. Meek

> told Mr. Kidd to do whatever it takes to fix it. Mr. Kidd went to The Plumbing Authority, which was close to [Mr. Meek's] office, and told them to go out and find out what the problem was and take care of it. The representative of The Plumbing Authority told Mr. Kidd that they would do so and that -- Mr. Meek believed that they would take care of the issue.

> Mr. Kidd, at the direction of [Mr. Meek], went to Home Depot later and purchased a plumbing snake and again attempted to remedy the problem but was unable to.

> * * *

> [Mr. Meek] continued to contact The Plumbing Authority to see why they had not resolved the issue, but they failed to do anything and kept putting [Mr. Meek] off. Mr. Kidd also contacted The Plumbing Authority on more than two occasions trying to get them to take care of the problem.

> [Mr. Meek] again told Mr. Kidd to get it fixed a.s.a.p. On May 31st, 2023, [Mr. Meek] contacted Roto-Rooter, which came out to the house and snaked the plumbing and found a rag at the end of the cable . . . . They ran water in the tub for 10 to 15 minutes with no backup. The note from Roto-Rooter also states that the camera sees roots in the main line drain.

---

[9] In addition to holding a contractor's license, Mr. Kidd testified that "probably 40, 50 different times [he had] replaced commodes and toilets, [he had] replaced plumbing [in] probably about 12 to 15 full houses[,]" and he had experience unclogging pipes when a plumbing system would not drain.

- 14 -

* * *

On June 4th, [Ms. Smith] sent another text to [Mr. Meek] stating [that the issue was re-occurring].

On June 5th, [Mr. Meek] again had Roto-Rooter return to the house. They ran a high-pressure jet through the pipe and then ran a camera through the pipe again. And this time the Roto-Rooter report states, quote, found a spot where a cast iron pipe meets the concrete, looks to be broken down, has some mud and roots in that area, close quote. They recommended repair. . . . Mr. Kidd later dug up the pipes and testified the pipes were not broken down.

* * *

Mr. Kidd further testified that [Ms. Smith] informed him that they continued to use the restroom during the time that the plumbing issue continued, and that someone in the house was using paper towels. This appears to be confirmed by Exhibits 2 and 4 in the record. And [Ms. Smith] did not deny or put on any rebuttal testimony to refute that testimony.

* * *

[Ms. Smith] argues that [Mr. Meek] disregarded and ignored the issues, that she should, as a result, be entitled to recover from [Mr. Meek].

From everything that the Court has heard and the Court's review of the exhibits that have been entered in the record and based on the Court's determination of the credibility of the witnesses, the Court is of the opinion that [Ms. Smith] has failed to prove that [Mr. Meek] violated the Tennessee Residential Landlord and Tenant Act and, further, that [Mr. Meek] did everything that he could and what a reasonable person would do to alleviate the issues, and [Ms. Smith's] actions and/or the actions of those living in the household aggravated the living conditions.

We agree with the Circuit Court's findings.

ii.

Next, Ms. Smith argues that the Circuit Court erred in finding Mr. Meek and Mr. Kidd to be credible and Ms. Smith not to be credible. As to Mr. Meek, Ms. Smith notes that the Circuit Court "itself recognized [his] difficulty remembering dates[.]" She argues that the Circuit Court should not have found Mr. Kidd credible because of his business

relationship with Mr. Meek and because Mr. Meek is also his landlord. Finally, regarding her own testimony, Ms. Smith argues that "there appears to be a discrepancy in [the Circuit Court's] standard when evaluating [her] credibility." She also complains that the Circuit Court "stated little to no support for its finding [and] appears to base its conclusion, at least in part, on [Ms. Smith's] admissions of her work history."[10]

When considering a witness's credibility, a trial court may consider not only the witness's demeanor but also the witness's "reputation for truth and veracity; intelligence; respectability; interest in the outcome of the trial; feelings about the case, parties, or other witnesses; bias or lack thereof; means of knowledge; reasonableness of statements; and general character." *Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 301 (Tenn. 2024) (citing *State v. Ellis*, 453 S.W.3d 889, 904 (Tenn. 2015)). "Corroborating or conflicting evidence or other proof in the record can also be used to [assess] witness credibility." *Id.* at 302 (citing *Ellis*, 453 S.W.3d at 904; *State v. Bilbrey*, 858 S.W.2d 911, 914 (Tenn. Crim. App. 1993) (Tipton, J., concurring)).

We note, as did the Circuit Court, that none of the witnesses could precisely remember the dates at issue in this case. Regardless, the Circuit Court noted multiple times that Ms. Smith's testimony conflicted with the record or otherwise called her credibility into question:

> The parties entered into a . . . residential lease . . . for [Ms. Smith] to lease a one-bedroom residential property from [Mr. Meek] for the sum of $1,200 per month.

> [Ms. Smith's] testimony was that the initial lease amount of $1,050 per month and it was later changed to $1,200 per month; however, nothing in the proof substantiates this testimony.

> The contract is not ambiguous as to the amount, and therefore the Court finds . . . [Mr. Meek's] testimony to be credible as to the amount of the rent to be set out in the contract.

> [Ms. Smith] and her 12-year-old son, and sometimes her boyfriend, lived in the house from January until sometime in June of 2023, part of which would be a violation of the lease, but that has not been raised by [Mr. Meek].

\* \* \*

---

[10] At trial, Ms. Smith testified that she had contacted an individual whom she described as her "boss under the table" to come out and try to fix the plumbing issue. Ms. Smith's counsel objected to a line of questioning about the relationship between Ms. Smith and this individual, at which time the Circuit Court noted that it was "curious about this relationship as it goes to credibility."

- 16 -

. . . [Ms. Smith] further testified that she called Benjamin Sweet -- who she worked with under the table because she was on SSI and did not want to declare that income on her taxes -- and Mr. Sweet came out to try to assist her.

\* \* \*

Based on the [Second Complaint], on the day it was filed, the General Sessions Court issued an order which ordered [Mr. Meek] to immediately repair the plumbing, repair all windows to normal, secure operation, and to repair the central air conditioning or provide temporary air conditioning units.

. . . [T]he weekend before [Ms. Smith filed her Second Complaint,] Mr. Kidd had opened the windows and installed two additional air conditioning units. The testimony is uncontroverted that the house never had central heat and air conditioning. Additionally, the testimony is uncontroverted that the plumbing was functioning when this [Second Complaint] was filed.

Additionally, the testimony was that [Ms. Smith] paid the first month's rent but failed to pay rent in February, June, or July, and that she only paid a partial payment of $600 in May.

We must give "considerable deference" to a trial court's credibility findings and may only overturn such findings in the face of "clear and convincing evidence to the contrary." *Hughes*, 340 S.W.3d at 360 (citing *Est. of Walton*, 950 S.W.2d at 959; *Wells*, 9 S.W.3d at 783). Ms. Smith does not point to anything in the record or in Mr. Kidd's testimony to suggest that his testimony was not credible, despite his relationship with Mr. Meek. Ms. Smith's primary complaint about Mr. Meek's credibility is his inability to remember dates. However, as the Circuit Court found, there were inconsistencies between Ms. Smith's representations to the lower courts and the record. We do not find clear and convincing evidence upon which to overturn the Circuit Court's credibility findings; therefore, we affirm such findings.

*e.*

Finally, Ms. Smith argues that the Circuit Court erred in not awarding her punitive damages. "[I]t is well-settled that a party is entitled to punitive damages only if [she] recovers actual damages." *Bogle ex rel. Bogle v. Nighthawk Radiology Servs., LLC*, No. M2014-01933-COA-R3-CV, 2016 WL 1398931, at *12 (Tenn. Ct. App. Apr. 6, 2016) (collecting cases). Because the Circuit Court did not award Ms. Smith actual damages, she cannot be awarded punitive damages.

- 17 -

*f.*

Mr. Meek requests his attorney's fees on appeal pursuant to Tennessee Code Annotated section 27-1-122.

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. "A frivolous appeal is one that is devoid of merit, *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978), or one that has no reasonable chance of succeeding." *Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003) (citing *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977)). On one hand, section 27-1-122 "must be interpreted and applied strictly so as not to discourage legitimate appeals . . . ." *Davis*, 546 S.W.2d at 586. On the other hand, "[s]uccessful litigants should not have to bear the expense and vexation of groundless appeals." *Id.* Given the competing considerations, whether to award damages under section 27-1-122 rests soundly within the reviewing court's discretion. *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009) (citing *Whalum v. Marshall*, 224 S.W.3d 169, 180–81 (Tenn. Ct. App. 2006)). In this case, we respectfully decline to award attorney's fees.

## CONCLUSION

For the aforementioned reasons, we affirm the judgment of the Circuit Court for Knox County. Costs of this appeal are taxed to the Appellant, Stacie Smith, for which execution may issue if necessary.

/s/ KRISTI M. DAVIS
KRISTI M. DAVIS, JUDGE